**COAST FEDERAL BANK, FSB, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 02–5032.

United States Court of Appeals, Federal Circuit.

March 24, 2003.

Charles J. Cooper, Cooper & Kirk, PLLC, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Michael W. Kirk. Of counsel were David H. Thompson and Derek Lawrence Shaffer.

1. Pursuant to Order of this court dated February 14, 2003, this appeal is being heard *en*

David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; Jeanne E. Davidson, Deputy Director; and John N. Kane, Jr., Trial Attorney. Of counsel was John J. Hoffman, Trial Attorney.

Before MAYER, Chief Judge, NEWMAN, MICHEL, LOURIE, CLEVENGER, RADER, SCHALL, BRYSON, GAJARSA, LINN, DYK, and PROST, Circuit Judges.

Opinion for the court filed by Circuit Judge GAJARSA, in which Chief Judge MAYER and Circuit Judges PAULINE NEWMAN, MICHEL, LOURIE, CLEVENGER, RADER, SCHALL, BRYSON, LINN, DYK, and PROST join.

Concurring opinion filed by Circuit Judge MICHEL.

GAJARSA, Circuit Judge.

The history of the savings and loan crisis of the 1980s and the ensuing enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (codified in scattered sections of 12 U.S.C.), is ably summarized in *United States v. Winstar Corp.*, 518 U.S. 839, 843–58, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("Winstar"). In this *Winstar*-related case, Coast Federal Bank, FSB ("Coast") appeals the final judgment of the United States Court of Federal Claims granting partial summary judgment for the United States ("government") on the issue of damages. *Coast Fed. Bank, FSB v. United States*, 48 Fed. Cl. 402 (2000). Because the Assistance Agreement ("Agreement") unambiguously incorporates Generally Accepted Accounting Principles ("GAAP"), which require the amortization of goodwill, we affirm.[1]

*banc.* 320 F.3d 1338.

## I. BACKGROUND

In 1987, Coast and the Federal Savings and Loan Insurance Corporation ("FSLIC"), an agency of the Federal Home Loan Bank Board ("Bank Board"), entered into a contract for Coast to acquire Central Savings and Loan Association of San Diego ("Central"), an insolvent thrift with net liabilities of $347 million. The Agreement included a $299 million cash contribution from FSLIC and treated this cash contribution as a credit to Coast's regulatory capital. Coast made no payment from its own funds.

The "Accounting Principles" clause of the Agreement states in pertinent part:

> Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of the Agreement, applicable regulations of the Bank Board or [FSLIC], or any resolution or action of the Bank Board approving or relating to the Acquisition or to this Agreement, then this Agreement, such regulations, or such resolution or action shall govern.

Agreement § 20, Accounting Principles.

The Agreement also includes a provision in § 6(a)(1)(C) for treating the cash contribution as a credit to regulatory capital:

> For purposes of reports to the Bank Board other than reports or financial statements that are required to be governed by generally accepted accounting principles, the cash contribution made under this § 6(a)(1) shall be credited to [Coast's] net worth account and shall constitute regulatory capital. It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from [FSLIC] that must be reflected in any filing that [Coast] may make, whether to the Bank Board or otherwise, that requires the submission of financial statements prepared in accordance with generally accepted accounting principles.

Agreement § 6(a)(1)(C), Payments and Contributions.

In 1992, Coast filed suit in the Court of Federal Claims alleging that enactment of FIRREA breached the Agreement and damaged Coast. The suit was stayed pending resolution of *Winstar*. Following the Supreme Court's *Winstar* decision, Coast moved for partial summary judgment on the issue of liability. *Coast*, 48 Fed. Cl. at 402. After the government conceded the existence of a contract between the parties and the breach of that contract, the Court of Federal Claims granted partial summary judgment for Coast on the issue of liability. *Id.* Following extensive fact and expert discovery, the parties cross-moved for summary judgment on the issue of damages. *Id.* Ruling on that motion, the Court of Federal Claims held that § 20 of the Agreement required amortization of goodwill in accordance with GAAP. *Id.* at 444. Coast then conceded that it could not prove damages and the Court of Federal Claims granted partial summary judgment for the government on the issue of damages. *Id.* Coast timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II. STANDARD OF REVIEW

Summary judgment shall be rendered if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. Cl. R. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). We review the grant of partial summary judgment by the Court of Federal Claims, as well as its interpretation of the Agreement, *de novo. Cal. Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1346 (Fed.Cir.2001) (citing *Winstar Corp. v. United States,* 64 F.3d 1531, 1539 (Fed.Cir.1995) *(en banc )* (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505), *aff'd, Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964; *Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1131 (Fed.Cir. 1998)), *cert. denied* 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002).

### III. DISCUSSION

This case presents the question whether the Court of Federal Claims correctly granted partial summary judgment for the government on the issue of damages by interpreting the Agreement to require amortization of goodwill in accordance with GAAP.

 Contract interpretation begins with the language of the written agreement. *Foley Co. v. United States,* 11 F.3d 1032, 1034 (Fed.Cir.1993). It is significant in this case that both Coast and the government agree that the contract is unambiguous. Where, as here, the provisions of the Agreement are phrased in clear and unambiguous language, they must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them. *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir. 1996). The Agreement must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts. *Id.*

 Relying on (1) the statement in § 6(a)(1)(C) that "the cash contribution ... shall be credited to [Coast's] net worth account and shall constitute regulatory capital" and (2) extrinsic evidence, Coast

argues that regulatory capital is "permanent," which it assumes precludes amortization of a corresponding amount of goodwill. The government, however, urges us to look no further than the plain language of the contract to find that Coast was required to abide by GAAP, which requires the amortization of goodwill.

We agree that the Agreement unambiguously incorporates GAAP and does not support Coast's interpretation. Section 20 of the Agreement states in pertinent part:

> *Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of the Agreement,* applicable regulations of the Bank Board or [FSLIC], or any resolution or action of the Bank Board approving or relating to the Acquisition or to this Agreement, then this Agreement, such regulations, or such resolution or action shall govern.

Agreement § 20, Accounting Principles (emphasis added). Section 20 requires that the computations and filings made pursuant to the Agreement be prepared in accordance with GAAP, unless provisions elsewhere in the Agreement authorize a departure from GAAP. Thus, the sophisticated parties in this case incorporated into the Agreement accounting practices and established meanings forged in the relevant GAAP.

GAAP are the official standards adopted by the American Institute of Certified Public Accountants ("AICPA"), such as AICPA Accounting Research Bulletins, Accounting Principles Board ("APB") Opinions, and Financial Accounting Standards Board ("FASB") Statements and Interpretations. *See generally* Donald E. Kieso et al., *Intermediate Accounting* 14–15 (10th ed.2001). Particularly germane to

this case, FASB Statement No. 72, entitled "Accounting for Certain Acquisitions of Banking or Thrift Institutions," requires that if, and to the extent that, the fair value of liabilities assumed exceeds the fair value of identifiable assets acquired in the acquisition of a banking or thrift institution, the intangible asset recognized generally must be amortized. *FASB Statement of Financial Standards No. 72* (Feb.1983); cf. *APB Opinion No. 17* (Aug.1970) (stating that intangible assets should never be written off immediately or amortized over more than forty years), *superseded by FASB Statement of Financial Standards No. 142* (June 2001) (stating that intangible assets that have indefinite useful lives will not be amortized but rather will be tested at least annually for impairment).

The Court of Federal Claims determined that FASB Statement No. 72 requires Coast to amortize goodwill recognized under the Agreement over a period of 12.7 years. *Coast,* 48 Fed. Cl. at 411. Goodwill, an intangible asset, is the excess of cost over the fair value of the identifiable net assets acquired. *See, e.g.,* Kieso et al., *supra,* at 608–09. In this case, goodwill recognized under the Agreement amounted to $347 million, i.e., the difference between the $347 million of Central's net liabilities and the zero dollars Coast contributed to the transaction. Accordingly, GAAP require Coast to amortize the $347 million of goodwill over a period of 12.7 years.

To be sure, in some respects the terms of the Agreement conflict with GAAP. For example, as discussed below, GAAP, which require Coast to offset the $347 million of goodwill with the $299 million cash contribution, would not allow Coast to recognize $299 million of goodwill as an asset on its balance sheet, because such goodwill is "fictitious"—there was no goodwill here in the traditional sense. *See Newark Morn-*

*ing Ledger Co. v. United States,* 507 U.S. 546, 555–57, 113 S.Ct. 1670, 123 L.Ed.2d 288 (1993). But both parties agree that the Agreement allows such goodwill to be recognized on the balance sheet. The question here is whether the Agreement also requires an additional departure from GAAP, i.e., nonamortization of this "fictitious" component of goodwill. We conclude that it does not.

Coast does not dispute that GAAP requires amortization of goodwill; however, Coast argues that the phrases "shall be credited" and "shall constitute" in § 6(a)(1)(C) indicate "permanent" regulatory capital, which it assumes precludes amortization of a corresponding amount of goodwill. The phrases "shall be credited" and "shall constitute" in § 6(a)(1)(C) authorize a *limited* deviation from GAAP by permitting Coast to credit the $299 million cash contribution to increase regulatory capital instead of requiring Coast to credit the cash contribution to decrease the $347 million of goodwill. It is important to note that because of this forbearance, Coast was able to use the $299 million cash contribution to fulfill its regulatory capital requirements, which "was attractive because it inflated the institution's reserves thereby allowing the thrift to leverage more loans (and, it hoped, make more profits)." *Winstar,* 518 U.S. at 851, 116 S.Ct. 2432 (citations omitted). But nothing in the language of § 6(a)(1)(C) authorizes an additional departure from GAAP, i.e., nonamortization of goodwill corresponding in amount to the $299 million credit to regulatory capital. "If we accepted [Coast's] argument, we would have to rewrite the contract, and insert words the parties never agreed to, which we do not have the authority to do." *George Hyman Constr. Co. v. United States,* 832 F.2d 574, 581 (Fed.Cir.1987). Indeed, the Supreme Court in *Winstar* interpreted similar lan-

guage to require amortization of goodwill. 518 U.S. at 866–67, 116 S.Ct. 2432.

Coast cannot rely on extrinsic evidence to interpret the phrases "shall be credited" and "shall constitute" to contradict the plain language of the Agreement. If the "provisions are 'clear and unambiguous, they must be given their plain and ordinary meaning,'" *Landmark Land Co. v. Fed. Deposit Ins. Corp.*, 256 F.3d 1365, 1373 (Fed.Cir.2001) (quoting *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed.Cir.1993)), and we may not resort to extrinsic evidence to interpret them, *City of Tacoma v. United States*, 31 F.3d 1130, 1134 (Fed.Cir.1994) ("Outside evidence may not be brought in to create an ambiguity where the language is clear."); *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir.1988) ("Extrinsic evidence will not be received to change the terms of a contract that is clear on its face."). Although we need not consider the extrinsic evidence to interpret this unambiguous Agreement, we note that much of it is consistent with the Agreement's plain meaning. Indeed, the Court of Federal Claims examined the contemporaneous evidence and determined that (1) Alvin Smuzynski, the regulator who approved Coast's forbearance and who advised the Bank Board chairman, testified that he believed that the goodwill recognized under the Agreement would be subject to amortization, *Coast*, 48 Fed. Cl. at 415; (2) the Thrift Financial Reports ("TFR") and accompanying instructions then used for thrift reporting also support the view that the government interpreted GAAP as requiring amortization of goodwill corresponding in amount to the regulatory capital, *id.*; and (3) the deposition testimony of Edwin John Gray, former Bank Board chairman "indicates considerable confusion about whether the deposing attorney's references to a 'capital credit' referred to the cash itself or to the accounting treatment

of it," *id.* at 418. We see no reversible error in the conclusion of the Court of Federal Claims that "[n]either the TFR instructions' references to 'permanence' nor Mr. Gray's ambiguous references to 'perpetuity' require the court to ignore the text of the contract." *Id.* at 419.

Finally, the phrases "shall be credited" and "shall constitute" in § 6(a)(1)(C), while not facially inconsistent with Coast's view of "permanent" regulatory capital, are fully consistent as well with the required amortization of goodwill. Coast's assumption that if regulatory capital is "permanent" then goodwill *must* be nonamortizing is flawed. The Supreme Court's *Winstar* decision noted that both amortizable goodwill and permanent regulatory capital may be present at one and the same time. 518 U.S. at 867, 116 S.Ct. 2432. In any event, even if regulatory capital were "permanent," it does not follow that goodwill would be nonamortizable. The fundamental equation of accounting requires that assets equal liabilities plus shareholder's equity. *See, e.g.*, Kieso et al., *supra*, at 70–71. Here, the $299 million "permanent" credit to regulatory capital (equity) must be balanced by either a debit to an asset account (not *necessarily* goodwill), a debit to a liability account, a debit to shareholder equity, or any combination of debits corresponding in amount to the credit to regulatory capital. Thus, the "permanent" regulatory capital, for example, can be balanced by an equal amount of unspent cash. That possibility negates the need for nonamortizing goodwill.

In sum, we agree with the Court of Federal Claims that proper interpretation of the Agreement requires amortization of goodwill in accordance with GAAP. Section 20 of the Agreement unambiguously incorporates GAAP and GAAP require the amortization of goodwill. When the con-

tractual language is unambiguous on its face, our inquiry ends and the plain language of the Agreement controls.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the Court of Federal Claims.

*AFFIRMED.*

MICHEL, Circuit Judge, concurring.

Although joining the majority, I wish to add several observations. As author of the panel opinion vacated and replaced by the opinion to the contrary effect that I now join, I would like to explain how the panel majority erred.

What made Coast's Agreement unusual was language added, as section 6(a)(1)(C), to that contained in the typical Agreement. It consisted of two parts: (1) "the cash contribution ... shall be credited to [Coast's] net worth account"; and (2) "shall constitute regulatory capital." The first clause essentially restates what in the case of the typical Agreement is contained only in an attached letter authorizing accounting forebearances (from Generally Accepted Accounting Principles). It is referred to as "SM–1." Arguably, when contained only in such a "side letter," this language can be nullified any time by subsequent changes in regulation or policy. However, when, as here, it is inserted into the Agreement itself, the practical effect is to preclude the government from cancelling this forbearance between the signing of the Agreement and the crediting of the cash contribution to the net worth account of the acquiring thrift for the year of the transaction, or indeed in any subsequent year. Without the forbearance, the credit

to capital (net worth)—on the right-hand (liability and capital) side of the balance sheet—would not be allowed. Without it, all credits and debits respecting the FSLIC cash contribution would appear on the left-hand (asset) side.

Similarly, addition of the second clause to the Coast Agreement (especially the word "shall") had the practical effect of emphasizing that it barred the government from cancelling this section 6(a)(1)(C) right which clearly applies not only in the first year, but also in years subsequent to the year of acquisition, by later changing regulations or agency policy. Protecting against such future regulatory contingencies is exactly what Coast's negotiator, Richard Fink, averred was the purpose of his insisting that the first clause be added to the Agreement itself instead of being contained only in a "side letter," and that the second clause be inserted too. No contrary testimony was presented.

To the extent the panel deduced from such added language the parties' agreement to provide the capital credit with "permanence," the panel was correct. Where it erred was to assume that permanence of the right to credit the amount to capital (right-hand side) in year one and each subsequent year *necessarily* meant also that the parties *impliedly* agreed to forbear the amortization of the portion of "goodwill" (left-hand side) corresponding to that amount. Admittedly, such non-amortization would be a sharp departure from the requirement of GAAP.

"Shall constitute regulatory capital," however, does not mean "shall be credited to regulatory capital." It simply means it shall tend to increase the amount shown on

the line in the financial balance sheet called "Total Regulatory Capital" from what it otherwise would be. But the effect and the actual accounting entries are different. By definition, Total Regulatory Capital is the sum of Contributed Capital and Retained Earnings, the latter reflecting certain expenses. Thus, one cannot credit an amount directly to Total Regulatory Capital. But the panel assumed one could do so. Although "boosting" regulatory capital, the amount corresponding to the cash contribution is actually entered as a credit on the line called "Contributed Capital." That line is then subject to reduction for certain expenses, including those related to annual straight-line amortization of goodwill, which decrease the amount entered under "Retained Earnings" from what it otherwise would be.

The panel got confused by the language of the testimony of the several witnesses. It failed to see that the permanence Fink urged he sought and obtained, as Chairman Gray agreed, was merely of the credit to Contributed Capital, not directly to Total Regulatory Capital, several lines below. That credit truly is "to the net worth account" and it does ("shall") permanently "constitute regulatory capital" in the sense that it increases Total Regulatory Capital compared to what it would otherwise be, year by year. But all this can occur without *also* requiring that the goodwill not amortize. In this way the testimony of Fink, Coast's CEO, Gray and others may be fully reconciled. However, the panel took too literally testimony by Fink, Coast's CEO and others that "regulatory capital" was credited.

Finally, to depart from GAAP, Section 20 requires that the Agreement must "otherwise provide." This Agreement, however, was silent about non-amortizing of the portion of goodwill that corresponded to the credit of $299 million to Contributed

Capital. The panel reasoned, incorrectly, that the permanence agreed to could only be achieved by not amortizing goodwill. That unfortunately was a logical error. Although all the testimony referred to making permanent the "credit" to "regulatory capital," the actual accounting entries were necessarily otherwise. In short, imprecise terminology led to incorrect logic.