STERLING SAVINGS, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 95–829 C.

United States Court of Federal Claims.

Aug. 4, 2003.

William D. Symmes, Spokane, WA, counsel of record for Plaintiffs, with whom were Leslie R. Weatherhead and William M. Symmes.

Elizabeth M. Hosford, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, counsel of record for Defendant, with whom were Jeanne E. Davidson, Deputy Director; David M. Cohen, Director; and Stuart E. Schiffer, Deputy Assistant Attorney General.

## OPINION & ORDER

DAMICH, Chief Judge.

Before the Court in this *Winstar*-related case [1] are the parties' cross-motions for partial summary judgment on the issue of whether the offsetting goodwill associated with Federal Savings and Loan Insurance Corporation ("FSLIC") cash assistance, credited to Sterling's "net worth," was to be amortized by Sterling. For the reasons stated herein, the Court GRANTS Defendant's Cross–Motion for Partial Summary Judgment with respect to this issue and DENIES Plaintiff's Motion for Partial Summary Judgment on this issue.

## I. Background

The parties have thoroughly briefed the issue *sub judice*.[2] The Court must resolve the question whether the goodwill associated with FSLIC's cash contributions, in connection with Sterling's acquisition of two failed thrifts, Lewis Federal Savings & Loan Association of Chehalis, Washington ("Lewis") and Tri–Cities Savings & Loan Association of Kennewick, Washington ("Tri–Cities"), was to be to be amortized by Sterling according to the parties' agreements.[3] Lewis was a

---

1. *See generally United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. The parties filed two supplemental briefs concerning the Federal Circuit's decision, 309 F.3d 1353, and decision *en banc* in *Coast Federal*

*Bank, FSB v. United States*, 323 F.3d 1035 (Fed. Cir.2003).

3. The Court issued an opinion on the Government's contractual liability on September 12, 2002, *see* 53 Fed.Cl. 599, wherein the underlying

failed thrift that was taken over by the FSLIC in 1985 and thereafter acquired by Plaintiff. *Sterling Savings v. United States,* 53 Fed.Cl. 599, 602 (2002). The FSLIC contributed $1.75 million to the acquisition and Sterling did not invest any money in the acquisition. *Id.* Sterling acquired Tri–Cities in 1988 in response to a bid proposal by FSLIC. In connection with the Tri–Cities acquisition, the FSLIC contributed $11,730,128 pursuant to the terms of the Assistance Agreement. Thus, the total contribution by the FSLIC with respect to these acquisitions was $13,480,128.

The Government frames the issue as whether the goodwill created by the FSLIC's cash contributions to the Lewis and Tri–Cities acquisitions was to be permanently recorded and reported as a nonamortizing intangible asset. Sterling believes it is more generally an issue of the parties' intent to treat the FSLIC cash contributions as permanent regulatory capital and that resort to extrinsic evidence will reveal the parties' true intent. Nevertheless, neither party disputes that the contract itself is unambiguous on its face. *See e.g.,* Plaintiffs' Memorandum Re: Motion to Strike the Declaration of Joe A. Hargett and Its Surreply Regarding the Permanency and Non–Amortization of the FSLIC Assistance at 10–11, 15–16 (hereinafter, "Pl.'s Mem. & Sur.") ("the parties mutual intent in this case may be gleaned from the plain language of the agreements . . . ."); Defendant's Supplemental Brief Addressing the Effect of the Federal Circuit's En Banc Decision in Coast Federal Bank, FSB v. United States on Sterling Savings Association, et al. v. United States (hereinafter "Def.'s Second Supp. Br.") at 2–3. More-

over, the Government agrees that the FSLIC cash assistance was provided to Sterling on a permanent, nonrefundable basis. Defendant's Supplemental Reply Brief With Respect to the Amortization of Offsetting Goodwill Associated with FSLIC Assistance, filed Jan. 24, 2003, at 6 (hereinafter "Def.'s Supp. Reply"). The Government contends, however, that the issue is not the permanence of the cash itself, but rather, the amortization of the offsetting goodwill associated with the assistance. Defendant argues that pursuant to the terms of the contract, Sterling was to amortize all intangibles, including the offsetting goodwill. A review of the parties' agreements and the accounting treatment relevant to these transactions is necessary to appreciate the issue posed by the parties' motions for partial summary judgment.

When Sterling acquired the failed thrifts, Defendant permitted Sterling to record on the books the thrifts' negative net worth as an unidentified intangible or goodwill. The goodwill was counted toward regulatory capital. *See Sterling,* 53 Fed.Cl. at 609. "[G]oodwill is created when a purchaser pays an amount in excess of the fair value of the net assets of an entity to acquire that entity . . . even if the purchaser pays nothing to acquire the entity." Pl.'s App. K ¶ 4; *see also Coast,* 323 F.3d at 1039 ("Goodwill, an intangible asset, is the excess of cost over the fair value of the identifiable net assets acquired."). Under the policy of the Financial Accounting Standards Board ("FASB"), FASB Statement No. 72 ("FASB 72"), titled, "Accounting for Certain Acquisitions of Banking or Thrift Institutions," issued in 1982, goodwill is amortized over a period no greater than the estimated remaining life of

facts with respect to these acquisitions are discussed at length. Thus, the Court will only discuss the facts as necessary, when they are relevant to the disposition of the parties' motions for partial summary judgment. By way of background, in the Lewis and Tri–Cities acquisitions, the Court found an express promise based on the Assistance and Acquisition Agreements, bank board resolutions, and forbearance letters entered into in connection with these acquisitions. The Court held that the Government, in enacting and enforcing the provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183, (codified in scattered sections of 12

U.S.C.) against Sterling, breached the contractual promises with Sterling. Specifically the Court held, in relevant part, that Defendant breached the contractual rights of Sterling to use supervisory goodwill and FSLIC cash contributions for regulatory capital purposes and to amortize the goodwill over 40 and 15 years respectively. Sterling actually acquired three thrifts (the third was Central Evergreen Federal Savings & Loan Association of Chehalis, Washington, ("Central Evergreen")). Nevertheless, the issue before the Court is only relevant to the Lewis and Tri–Cities acquisitions because the Central Evergreen acquisition was unassisted.

the long term interest-bearing assets acquired and any additional goodwill would be amortized on a straight-line basis over the expected life of the unidentified intangible, not to exceed 25 years. Pl.'s App. K ¶ 4. FASB 72 guided Sterling's accounting practices.

FSLIC cash contributions provided the acquirer of a failed or failing thrift with the opportunity to "reduce or eliminate the net deficiency in assets." Pl.'s App. K ¶ 6. According to FASB 72, any FSLIC cash contributions recorded in accordance with generally accepted accounting principles ("GAAP") would reduce the corresponding amount of goodwill associated with the acquisition. Pl.'s App. K ¶ 6. Only a forbearance from GAAP reporting would allow an acquirer, such as Sterling, to report the cash assistance as regulatory capital and not reduce the amount of goodwill reported. Pl.'s App. K ¶ 7. This type of goodwill was referred to as Regulatory Accounting Practices ("RAP") goodwill.[4] Id. at ¶ 8. Plaintiff requested such a forbearance, which was granted and reflected in Sterling's contracts with Defendant. Sterling was actually granted 3 different forbearances, the SM–1, SM–2, and SM–3 forbearances, as described in Memorandum SP–37a, which sets forth various standard regulatory forbearances granted by the then Federal Home Loan Bank Board ("FHLBB" or "Bank Board"). See Defendant's Supplemental Appendix ("Def.'s Supp.App.") filed Dec. 16, 2002, at 121. In relevant part, the forbearance letter to Sterling in connection with the Lewis transaction provided:

1. It is the FSLIC's intention that the cash contribution to be made to Sterling pursuant to an assitance [sic] agreement ("Assistance Agreement") to be entered into between the FSLIC and Sterling is to be a credit to Sterling's net worth; therefore, for regulatory accounting purposes, Sterling may book such contribution as a direct addition to its net worth.

4. RAP and GAAP were the two systems of accounting that thrifts used in connection with their reporting requirements. *Winstar*, 518 U.S. at 846, 116 S.Ct. 2432. In many instances, RAP

Def.'s Supp.App. at 119. This language is virtually identical to the SM–1 forbearance set forth in Memorandum SP–37a. Def.'s Supp.App. at 131. The Tri–Cities forbearance letter provided similarly:

4. *Regulatory Capital;* It is the FSLIC's intention that the initial cash contribution to be made to Sterling pursuant to the Assistance Agreement is to be a credit to Sterling's regulatory capital; therefore, for regulatory accounting purposes, Sterling may book such contribution as a direct addition to its capital.

Def.'s Supp.App. at 116.

The SM–1 forbearance was incorporated into the text of the Assistance Agreement itself in both the Lewis and Tri–Cities transactions. Section 3(a)(2) of the Lewis Agreement provides:

For purposes of reports to the Bank Board other than reports or financial statements that are required to be governed by generally accepted accounting principles, **all cash contributions made under this § 3 shall be credited to the ACQUIRING ASSOCIATION's net worth account.** It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the [FSLIC] that must be reflected in any filing that the ACQUIRING ASSOCIATION may make, whether to the Bank Board or not, that requires the submission of financial statements prepared in accordance with generally accepted accounting principles.

Def.'s Supp.App. at 147 (emphasis added).

Similarly Section 3(a)(2) of the Tri–Cities Agreement states:

For purposes of reports to the Bank Board other than reports or financial statements prepared for reporting or disclosure purposes that are required to be governed by GAAP, the cash contribution made under § 3(a)(1), **shall be credited to the ACQUIRING ASSOCIATION's regulatory capital account and shall constitute reg-**

replaced GAAP, which the House Banking Committee believed attributed to "the worsening financial condition of the industry." *Id.*

ulatory capital as defined in § 561.13 of the Insurance Regulations. 12 C.F.R. § 561.13 (1987). It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the [FSLIC] that must be reflected in any filing that the ACQUIRING ASSOCIATION may make, whether to the Bank Board (for reporting or disclosure purposes) or otherwise, that requires the submission of financial statements prepared in accordance with GAAP.

Appendix to Defendant's Supplemental Brief Addressing the Effect of the Federal Circuit's En Banc Decision in Coast Federal Bank, FSB v. United States on Sterling Savings Association, et. al. v. United States (hereinafter "Def.'s Second Supp.App.") at 56 (emphasis added).[5]

The Assistance Agreements also specified that any computations made in connection with the agreements were governed by GAAP, unless GAAP conflicted with applicable regulations of the Bank Board or FSLIC or any resolution or action of the Bank Board related to the agreements. For example, § 16 of the Tri–Cities Assistance Agreement stated:

§ 16 *Accounting Principles* Except as otherwise provided herein, any computations made for purposes of this Agreement shall be governed by GAAP as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the [FSLIC], or any resolution or action of the Bank Board approving or relating to the Acquisition or this Agreement, then this Agreement, such regulations, or such resolution or action shall govern.

Def.'s Second Supp.App. at 108. *See also* § 9 of the Lewis Assistance Agreement. Def.'s Second Supp.App. at 28. Section 16 also set forth the authority that controls in the case of an ambiguity:

In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations and the Bank Board's resolutions or actions relating to the Acquisition or this Agreement. If there is a conflict between such regulations and the Bank Board's resolutions and actions relating to the Acquisition or this Agreement, the Bank Board's resolutions and actions shall govern.

Def.'s Second Supp.App. at 108. *See also* § 9 of the Lewis Assistance Agreement. Def.'s Second Supp.App. at 28.

Nevertheless, the forbearance letters in connection with these acquisitions likewise granted Sterling what is known as an SM–2 forbearance. *See, e.g.,* Def.'s Supp.App. at 131. The SM–2 forbearance allowed Sterling to deviate from GAAP when recording the amortization of intangible assets, which according to FASB 72, would be amortized "over a period no greater than the estimated remaining life of the long term interest-bearing assets acquired." Pl.'s App. K ¶ 4. The Lewis forbearance letter provided:

2. For purposes of reporting to the Bank Board, the value of any intangible assets resulting from accounting for the Acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 40 years by the straight line method.

Def.'s Supp.App. at 120. Likewise, the Tri–Cities forbearance letter provided:

loan losses except specific allowances, (including those specific allowances established pursuant to §§ 561.16c, 563.17–2, and 571.1a of this subchapter) and any other nonwithdrawable accounts of an insured institution (excluding any Treasury shares held by the insured institution).

12 C.F.R. § 561.13 (1987). The Lewis Assistance Agreement did not mention regulatory capital. *See* § 3(a)(2) of the Assistance Agreement. Def.'s Supp.App. at 147.

---

5. Regulatory Capital was defined as:

[T]he sum of all reserve accounts, retained earnings, permanent common stock, permanent preferred stock, nonpermanent preferred stock issued prior to July 23, 1985, mutual capital certificates (issued pursuant to § 563.7–4 of this subchapter), securities which constitute permanent equity capital in accordance with generally accepted accounting principles (if approved by the Corporation), appraised equity capital (as defined in § 563.13(c) of this subchapter), allowances for

5. *Amortization of Unidentifiable Intangibles* For purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 15 years by the straight line method.

*See* Def.'s Supp.App. at 117. The SM–2 forbearance allowed Sterling to deviate from GAAP and FASB 72 governing the amortization of intangible assets. While the Government notes that the SM–2 forbearance granted to Sterling did not differentiate between RAP and GAAP goodwill, Sterling argues that SM–2 only applied to GAAP goodwill and not the RAP goodwill associated with FSLIC assistance. To support its argument Sterling points to the term "purchase method" in the SM–2 forbearance granted to Sterling. Plaintiff argues that the term "purchase method" is "widely accepted as the accounting treatment prescribed by FASB 72," which is the GAAP standard and "requires the goodwill to be reduced by the cash assistance before being amortized to expense." Pl.'s Mem. & Sur. at 13. Defendant says the entirety of the Lewis and Tri–Cities acquisitions were governed by the purchase method (as opposed to the pooling method for recording mergers), which requires the acquired thrift's assets to be "marked to market" in order to reflect the current market value cost, rather than the historical book value cost. Def.'s Opp. to Pl.'s Mot. to Strike at 15. The resulting net worth deficit is then recorded as goodwill. *Id.* Defendant contends that the SM–2 forbearance applied to all intangible assets, including RAP goodwill.

Similar arguments were raised by the parties in *Coast Federal Bank, FSB v. United States*, 48 Fed.Cl. 402 (2000). In *Coast*, the agreement at issue was strikingly similar. However, Coast requested, but was not granted, the SM–2 forbearance as Sterling was in the present case. *Coast*, 48 Fed.Cl. at 420. Nevertheless, plaintiff argued that the SM–1 forbearance was outside GAAP because it allowed a deviation from GAAP and its agreement with defendant did not require it to amortize RAP goodwill. *Coast*, 48 Fed. Cl. at 411. Plaintiff also argued that the history of nonamortization in the bank's reporting demonstrated that the parties did not intend amortization. *Id.* Defendant argued that the effect of the SM–1 forbearance was simply to allow the bank to record more regulatory capital than it otherwise would have under GAAP. *Id.* Judge Hewitt found for Defendant and interpreted the agreement to require the amortization of goodwill according to GAAP. *Id.* at 421.

On appeal, the Federal Circuit agreed with Judge Hewitt's analysis in that the agreement was somewhat ambiguous, but otherwise disagreed that the contract required the amortization of goodwill according to GAAP. *Coast Federal Bank, FSB v. United States*, 309 F.3d 1353, 1360–61 (2002). An *en banc* opinion vacated the panel decision. *Coast Federal Bank, FSB, v. United States*, 323 F.3d 1035 (Fed.Cir.2003). The Federal Circuit held that the contract was clear and unambiguous and the goodwill associated with FSLIC cash assistance was intended to amortize according to GAAP. *Id.* at 1038. Specifically, the court held that § 20 of the Assistance Agreement in Coast, which is nearly identical to §§ 16 and 9 of the Lewis and Tri–Cities Assistance Agreements, respectively, provided that GAAP would govern the accounting treatment of goodwill associated with the acquisition. *Id.* The court recognized that § 6(a)(1)(c), which specified that FSLIC cash contribution "shall constitute regulatory capital" and "shall be credited" to the bank's net worth, conflicted with GAAP and FASB 72. *Id.* Although this section of the agreement allowed Coast to credit the FSLIC cash contribution to increase its regulatory capital, instead of crediting the cash contribution to decrease an equal amount of goodwill associated with the transaction, the agreement did not provide for an additional departure from GAAP or "the nonamortization of goodwill corresponding in amount to the [FSLIC cash contribution] credit to regulatory capital." *Id.* at 1039. The Federal Circuit stated that Coast could not rely on extrinsic evidence to "contradict the plain language of the Agreement." *Id.* at 1040. The court stated "Coast's assumption that if regulatory capital is 'permanent' then goodwill *must* be nonamortizing is flawed." *Id.*

**450**

First, the Federal Circuit pointed to the Supreme Court's decision in *Winstar*, 518 U.S. at 867, 116 S.Ct. 2432, which recognized that permanent regulatory capital and goodwill can coexist. *Id.* Second, the court explained that even if Coast's regulatory capital were permanent, it does not follow that goodwill would be nonamortizing. *Id.* Judge Gajarsa, writing for the *en banc* court, reviewed the "fundamental equation of accounting," which "requires that assets equal liabilities plus shareholder's equity." *Id.* The Court expounded:

> Here, the $299 million "permanent" credit to regulatory capital (equity) must be balanced by either a debit to an asset account (not *necessarily* goodwill), a debit to a liability account, a debit to shareholder equity, or any combination of debits corresponding in amount to the credit to regulatory capital. Thus, the "permanent" regulatory capital, for example, can be balanced by an equal amount of unspent cash. That possibility negates the need for nonamortizing goodwill.

*Id.* Thus, the Court concluded that the agreement, which was "unambiguous on its face," required amortization of goodwill in accordance with GAAP. *Id.* at 1040–41. Judge Michel, writing a concurring opinion, explained the original panel's error in reasoning when it held that the goodwill was nonamortizing:

> To the extent the panel deduced from such added language ["shall constitute regulatory capital," "shall be credited"] the parties' agreement to provide the capital credit with 'permanence,' the panel was correct. Where it erred was to assume that permanence of the right to credit the amount to capital (right-hand side) in year one and each subsequent year *necessarily* meant also that the parties *impliedly* agreed to forbear the amortization of the portion of "goodwill" (left-hand side) corresponding to that amount. Admittedly, such non-amortization would be a sharp departure from the requirement of GAAP.

*Id.* at 1041. Judge Michel went on to explain that the contributed capital is permanent "in the sense that it increases Total Regulatory Capital compared to what it would otherwise be, year by year. But all this can occur without *also* requiring that the goodwill not amortize." *Id.* at 1042. The Court now considers Sterling's contracts in light of the Federal Circuit's guidance in *Coast*.

## II. Discussion

### A. The Standard for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact, and thus the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. After adequate time for discovery and on motion, summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, where that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. The Court must resolve any doubts about factual issues in favor of the non-moving party, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed.Cir.1998), and draw all reasonable inferences in its favor. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed.Cir.1995).

### B. The Plain Meaning of the Parties' Agreements Controls

The issue of whether the parties' agreements provided for the nonamortization of RAP goodwill is a matter of contract interpretation. Contract interpretation is an issue of law and begins with the language of the agreement at issue. *Coast*, 323 F.3d at 1038; *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed.Cir.1998). Both the Lewis and Tri–Cities Assistance Agreements

are strikingly similar to the agreement at issue in *Coast*, as discussed *supra* Part I. Section 3(a)(2) of the Lewis and Tri–Cities Assistance Agreements are similar to § 6(a)(1)(C) of the Coast Assistance Agreement in that they provide that the FSLIC cash contribution "shall be credited" to the bank's net worth, and in the Tri–Cities acquisition, specifically "shall constitute regulatory capital . . . ." Moreover, §§ 9 and 16, respectively, are nearly identical to § 20 of the Coast Assistance Agreement. In the present case, as in *Coast*, the parties agree that the Assistance Agreements are unambiguous. *See e.g.*, Pl.'s Mem. & Sur. at 10–11, 15–16; Def.'s Second Supp. Br. at 2–3. The Federal Circuit agreed with the parties and held that the provisions of the Coast Agreement were "phrased in clear and unambiguous language," and thus, "they must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them." *Coast*, 323 F.3d at 1038.

▇▇ Given the similarity of the language in the Lewis and Tri–Cities Assistance Agreements, the Court can only come to this same conclusion. The plain meaning of the contracts controls and the Court may not resort to extrinsic evidence to vary the terms of the agreements. *Coast*, 323 F.3d at 1038; *The American and British Manufacturing Co. v. United States*, 50 Ct.Cl. 204, 1915 WL 1113 (1915) ("The scope of a contract, as well as the intention of the parties in making the same, is to be gathered from the instrument itself, unless ambiguities intervene so patent upon the face of the writing that extraneous testimony alone will explain them."); *City of Tacoma v. United States*, 31 F.3d 1130, 1134 (Fed.Cir.1994) ("[E]xtrinsic evidence . . . may not be considered unless an ambiguity is identified in the contract language . . . Outside evidence may not be brought in to create an ambiguity where the language is clear."); *HRE, Inc. v. United States*, 142 F.3d 1274, 1276 (Fed.Cir.1998); *McAbee Construction, Inc., v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996). The plain language of the Assistance Agreements at issue does not support an interpretation that the goodwill associated with the FSLIC cash assistance is nonamortizing. Permanent regulatory capital and amortizing goodwill can coexist. *Winstar*, 518 U.S. at 866–67, 116 S.Ct. 2432 (discussing the "permanent capital credit" to Statesman's regulatory capital and the amortizing goodwill); *Coast*, 323 F.3d at 1040, 48 Fed.Cl. at 419. As the Federal Circuit explained in *Coast*, merely because a provision of the contract(s) provides that the cash contribution "shall be credited" to Sterling's net worth or regulatory capital account or "shall constitute regulatory capital" does not likewise mean that the goodwill associated with that assistance is nonamortizing. Even if the capital is permanent, it can be balanced by any debit to an asset account, not necessarily goodwill. *Coast*, 323 F.3d at 1040. The *Coast* Court provided the example where permanent capital could be balanced by an equal amount of unspent cash. *Id.*

Section 3(a)(2) of the Lewis and Tri–Cities Assistance Agreements clearly provides a deviation from GAAP in that it allows Sterling to record the full amount of the FSLIC cash contribution without reducing its goodwill by the same amount, as FASB 72 provides. This deviation from GAAP, an SM–1 forbearance, was promised to Sterling in its forbearance letters and was bargained for and incorporated into the terms of the Assistance Agreements. A further deviation from GAAP would be unwarranted in light of *Coast* unless bargained for and agreed to by the parties. *Coast*, 323 F.3d at 1039–41.

Unlike the plaintiff in *Coast*, Sterling did indeed request and was granted a further departure from GAAP. It was granted the SM–2 forbearance. As stated *supra* Part I, the SM–2 forbearance allowed Sterling to deviate from GAAP when recording the amortization of intangible assets, which according to FASB 72, would be amortized "over a period no greater than the estimated remaining life of the long term interest-bearing assets acquired." Pl.'s App. K ¶ 4. Thus, Sterling's acquisition documents differ from the Coast Agreement in that they allow it a further deviation from GAAP and FASB 72; the SM–2 forbearance granted to Sterling allows it to amortize the goodwill associated with FSLIC cash assistance for a period of

40 and 15 years respectively.[6] In sum, Sterling was allowed to credit the FSLIC cash assistance to its total regulatory capital, without reducing a corresponding amount of goodwill. This was done pursuant to the SM–1 forbearance and § 3(a)(2) of the Lewis and Tri–Cities Assistance Agreements. Sterling was also allowed a further deviation from GAAP, which allowed it to amortize the goodwill associated with that transaction over a period longer than that provided for by GAAP. The agreements do not provide for the complete nonamortization of goodwill.

Plaintiff's contention that the SM–2 forbearance did not apply to RAP goodwill, and rather to only GAAP goodwill, is unsupported by the record. Likewise, Plaintiff's suggestion that the "purchase method" language used in SM–2 is an indication that the forbearance only applies to GAAP is likewise unsupported. Applying the SM–2 forbearance in a merger reported under the purchase method does not make SM–2 inapplicable when RAP goodwill is involved, Nor does SM–2 somehow differentiate between RAP and GAAP goodwill. It merely allows a departure from GAAP with respect to the amortization of all intangible assets. Judge Hewitt rejected a similar argument by the plaintiff in *Coast*. Plaintiff argued that RAP goodwill did not arise from the application of the purchase method and that SM–2 therefore did not apply to RAP goodwill. Judge Hewitt explained that "purchase method accounting marked [the thrift's] assets and liabilities to market, rather than incorporating them into plaintiff's balance sheet without conducting an independent valuation." *Coast*, 48 Fed.Cl. at 420. Judge Hewitt concluded "[o]nly the purchase method creates goodwill, and it creates RAP goodwill . . . as well as GAAP goodwill." *Coast*, 48 Fed.Cl. at 420–21. The Court finds Judge Hewitt's analysis illustrative. Nothing in the SM–2 forbearance suggests it does not apply to

both RAP and GAAP goodwill, which was created by the purchase method of accounting. The forbearance does not distinguish between intangible assets.

Furthermore, Plaintiff's attempts to get this Court to consider extrinsic evidence when the Assistance Agreements are clear on their face are contrary to law and must fail. Plaintiff relies on *Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin.*, 169 F.3d 747 (Fed.Cir.1999), to support its contention that the Court should consider extrinsic evidence of the parties' intent. It is true that *Metric Constructors* would allow this Court to consider extrinsic evidence, such as trade usage, when determining whether the agreements at issue are ambiguous, 169 F.3d at 752–53; however, the Court has considered the record and determined that the agreements are clear on their face. "To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term." *Id.* at 751. Likewise, "[a] contracting party cannot, for example, invoke trade practice and custom to create an ambiguity where a contract was not reasonably susceptible of differing interpretations at the time of contracting." *Id.* at 752. Although the Court need not consider extrinsic evidence in order to interpret the parties' unambiguous agreements, *Coast*, 323 F.3d at 1040, for sake of argument, even if the Court considers the extrinsic evidence offered by Plaintiff, it does not support a contrary meaning or otherwise suggest an ambiguity in the contract language. The Court now examines the extrinsic evidence offered by the parties.

*C. The Extrinsic Evidence Does Not Support the Nonamortization of Goodwill Associated with FSLIC Assistance.*

As already stated, even if the Court were to consider the extrinsic evidence, it does not

6. The Lewis forbearance letter provided:
  2. For purposes of reporting to the Bank Board, the value of any intangible assets resulting from accounting for the Acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed *40 years* by the straight line method.
Def.'s Supp.App. at 120 (emphasis added). Likewise, the Tri–Cities forbearance letter provided:

  5. *Amortization of Unidentifiable Intangibles*
  For purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed *15 years* by the straight line method.
*See* Def.'s Supp.App. at 117 (emphasis added).

support Plaintiff's interpretation of the agreements. First, Sterling's course of performance suggests that the goodwill was amortizing. In fact, Sterling actually amortized the goodwill associated with the FSLIC cash assistance on its thrift financial reports ("TFRs") from 1986 to 1988. Ms. Nancy Shatto, a Sterling employee, attests that she recorded amortization of the total amount of intangible assets that Sterling reported on a "RAP basis" until 1989 because no one had instructed her to do otherwise. Pl.'s Supp. App. SS at 896 ¶ 12. She did this based on her knowledge of accounting. Likewise, Mr. Norman Judd, Shatto's supervisor, who was in charge of the books for a period during the relevant time, testified in deposition that he believed he was correctly amortizing the goodwill associated with the FSLIC cash assistance. Def.'s Supp.App. at 111. It was not until 1989 that Ms. Shatto amended the TFRs to *not* reflect the amortization of RAP goodwill. Pl's Supp.App. PP at 791. There is no clear reason why amortization stopped, other than Ms. Shatto's speculation that she was instructed to amend the 1989 TFR, by someone named "Cal," at the Office of Thrift Supervision ("OTS"). After talking with Cal, Ms. Shatto reduced the amount of amortizing goodwill associated with cash assistance to $0 and increased the amount of Total Regulatory Capital. Nevertheless, Ms. Shatto cannot remember the specifics of her conversation with Cal, rather she relies on her contemporaneous notes indicating the change after speaking with "Cal." Def.'s Supp.App. at 113–15; Pl.'s Supp.App. SS at 894–96 ¶¶ 4—11. Mr. William Byrne, Sterling's Chief Financial Officer ("CFO") at the time, states that Sterling "overlooked informing these employees not to amortize the goodwill." Pl.'s Supp.App. TT at 918, ¶ 8. Mr. Byrne said that although he reviewed the TFRs from time to time, he "never did a specific review of what was contained in line A–544 'Goodwill and Other,' or to what extent it is amortized." *Id.* These facts are undisputed. Sterling argues that this failure to amortize or communicate some direction to its employees does not constitute a waiver of its contractual rights. This may be true, but evidence of amortization does not support Sterling's contention that the goodwill

associated with FSLIC was intended to be nonamortizing.

Moreover, other statements in the record do not support the argument that RAP goodwill was intended to be nonamortizing. First, Sterling's President and Chief Operating Officer, Mr. William Zuppe, believed that amortization was required. In connection with the Tri–Cities acquisition, Mr. Zuppe said that the FHLBB allowed Sterling to credit $11.7 million in cash assistance, which "could be credited to net worth and treated as supervisory goodwill amortized over 15 years." Def.'s Supp.App. at 128. Mr. Zuppe's understanding is consistent with the plain language of the Tri–Cities Assistance Agreement. Mr. Byrne, Sterling's CFO, who believed that only GAAP goodwill required amortization, was unable to point to any language in the agreements during deposition that stated amortization was only required for the GAAP portion. Def.'s Second Supp. App. at 140. Mr. Byrne stated that "it seemed to be the logical conclusion." *Id.* Nevertheless, Mr. Byrne's assumptions about the agreements are not enough to create an ambiguity when the language is clear; an ambiguity is not created when the parties merely differ in their respective interpretations of a contractual term. *Metric Constructors, Inc.*, 169 F.3d at 751.

A review of the record shows support for Defendant's interpretation of the agreements, that the goodwill was to amortize according to the schedule set forth in the Lewis and Tri–Cities forbearance letters. For example, Darrell Dochow, the director of the division of FHLBB that was involved in negotiating and approving forbearances at the time of the Tri–Cities transaction, stated in deposition that all intangible assets would amortize according to the SM–2 forbearance, including goodwill. Def.'s Supp.App. at 379–380. He made no distinction for the goodwill associated with FSLIC cash assistance. *Id.* This deposition testimony is consistent with the plain meaning of the Assistance Agreements. Likewise, Ms. Patricia McJoynt, who negotiated the Tri–Cities acquisition for the Government, has said that the phrase "shall constitute regulatory capital" in § 3(a)(2) was not intended to address the nonamortization

of the goodwill associated with the cash contribution and neither was ¶ 4 of the Tri–Cities forbearance letter. Def.'s Supp.App. at 195–198, 234. In contrast, Ms. McJoynt's deposition lends support to the interpretation that the capital credit was permanent, which may coexist with amortizing goodwill on the balance sheet. Def.'s Supp.App. at 223. The testimony of Mr. James Faulstich, the FHLBB negotiator involved with the Lewis acquisition, is consistent with Ms. McJoynt's testimony. He said in deposition that the FSLIC cash assistance was to be treated as permanent capital, "which would help [Sterling] to meet the regulatory requirements, capital requirements, as set forth by the Bank Board." Pl.'s App. JJ at 572. This statement is likewise consistent with the plain meaning of the Assistance Agreements. Mr. Faulstich also testified in deposition that the $1.75 million FSLIC cash contribution was to be treated as permanent capital:

Q. Was it to be treated as permanent capital? Do you know?

A. It would be treated as—permanent capital, yeah, as a cash contribution.

Q. Not to be paid back at a later date? Not to be amortized over a period of time?

A. That would be correct.

Pl.'s App. V–1 at 108. The Court finds little support for the nonamortization of the *goodwill* associated with the cash assistance; permanent regulatory capital does not necessarily mean that the goodwill associated with that capital is nonamortizing. *See Coast,* 323 F.3d at 1041–42.

Furthermore, the opinion of Mr. Roger Orders, who is Plaintiff's expert, stating that the forbearances granted to Sterling only address and apply to GAAP goodwill is unsupported by the record. There is nothing in the forbearance letters that distinguishes between RAP and GAAP goodwill, rather the relevant language refers to intangible assets. Pl.'s App. UU at 1019–1031. Mr. Orders's opinion testimony cannot be used to alter the plain meaning of the agreements.

Finally, the Central Evergreen Agreement, including the business plan and the negotiations in connection with that agreement, do not support Plaintiff's assertion that the goodwill associated with the Lewis and Tri–Cities acquisitions is nonamortizing. Although Mr. Byrne attests that the parties were agreeing in the Central Evergreen Agreement "to include intangible assets as capital." Pl.'s App. FF–3 at 387, a declaration by Edward C. Hedland, the FHLBB supervisory agent that was involved in the negotiations shows that he disagrees. Mr. Hedland attests that although he knew of the Lewis and Tri–Cities acquisitions, "neither the Central Evergreen Agreement, nor the attached business plan and accompanying pro forma schedules, were intended to address the accounting treatment for the additional goodwill created by the FSLIC's cash contribution . . . ." Def.'s Second Supp.App. at 183, ¶ 8. Moreover, Mr. Byrne's assertions that Sterling bargained for permanent capital and would be able to count the capital as permanent if Sterling was to acquire Central Evergreen, Pl.'s App. NN, at 722, are not inconsistent with the plain meaning of the Lewis and Tri–Cities Assistance Agreements. The Assistance Agreements allowed Sterling to count the FSLIC cash contributions toward its net worth. Nor are Mr. Byrne's statements about permanent capital inconsistent with the understanding of Mr. Harold Gilkey, who represented Sterling in the acquisition of Central Evergreen and who believed that Sterling had acquired permanent regulatory capital in connection with the Lewis and Tri–Cities acquisitions. Pl.'s App. KK at 580.

In addition, the business plan and pro formas do little to contradict the clear language of the Lewis and Tri–Cities Assistance Agreements. As Defendant points out, some of Sterling's financial pro formas reported the full amount of FSLIC cash assistance on a separate equity line item, as "contributed capital," and there are no separate line items distinguishing between intangibles. Def.'s Second Supp.App. 201–202. Finally, Mr. Roger Orders, Plaintiff's expert who analyzed the Central Evergreen business plan, could not determine precisely "what went into the business plan in terms of amortization;" nor could he conclude whether it was prepared on a RAP or GAAP basis. Def.'s Second Supp.App. at 214–215; Pl.'s App. LL

610–11. Mr. Orders did not have detailed amortization schedules to rely on in forming his opinion, rather he reconstructed the numbers "based upon the numbers that are reflected in the business plan what probably was included in the amortization of goodwill," and from this Mr. Orders concluded that it could not have included the amortization of goodwill associated with cash assistance. Pl.'s App. LL 601–611. The Court does not find his opinion helpful to Plaintiff. Def.'s Second Supp.App. at 214–215. Thus, the Court cannot find that the Central Evergreen business plan "is a significant manifestation of the parties' understanding about how it was to calculate regulatory capital" or the business plan evinces their mutual intent to forego the amortization of RAP goodwill as Plaintiff urges it does. Pl.'s Supp. Resp. at 16.

In sum, viewing the facts in light most favorable to Sterling, the extrinsic evidence neither supports an interpretation contrary to that of the plain meaning of the Assistance Agreements nor does it suggest an ambiguity. Based on the plain meaning of the both the Lewis and Tri–Cities Assistance Agreements, goodwill associated with FSLIC cash assistance was to amortize according the schedule set forth in the forbearance letters issued by the FHLBB in connection with the thrift acquisitions, for 40 and 15 years respectively.

## III. Conclusion

For the reasons stated above, the Court GRANTS Defendant's Cross–Motion for Partial Summary Judgment on the issue of the amortization of goodwill associated with FSLIC cash assistance. The goodwill associated with this assistance was to amortize according to the terms of the SM–2 forbearance. Thus, Plaintiff's Motion for Partial Summary Judgment with respect to this issue is DENIED.

