# United States Court of Appeals for the Federal Circuit

———————————

**PREMIER OFFICE COMPLEX OF PARMA, LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2018-1231

———————————

Appeal from the United States Court of Federal Claims in No. 1:14-cv-01223-EJD, Senior Judge Edward J. Damich.

———————————

Decided: February 19, 2019

———————————

PETER J. GEORGITON, Dinsmore & Shohl, LLP, Columbus, OH, argued for plaintiff-appellant. Also represented by PETER W. HAHN.

ANNA BONDURANT ELEY, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by KENNETH DINTZER, ROBERT EDWARD KIRSCHMAN, JR., JOSEPH H. HUNT.

———————————

Before NEWMAN, WALLACH, and STOLL, *Circuit Judges.*

STOLL, *Circuit Judge.*

Premier Office Complex of Parma, LLC ("Premier") appeals the decision of the United States Court of Federal Claims granting the government's motion for summary judgment and denying Premier's cross-motion for summary judgment of liability. The contract between Premier and the government unambiguously requires Premier to provide a facility conforming to Level II security requirements as set forth under Interagency Security Committee ("ISC") standards. Premier's work in constructing such a facility thus falls within the scope of work of the contract. We affirm.

## BACKGROUND

In 2007, the Department of Veterans Affairs ("VA") sought to lease space in Parma, Ohio for use as a VA outpatient clinic ("Parma Clinic"). It issued a pre-solicitation Expressions of Interest memorandum, which stated that the lease would be for approximately 62,000–74,000 square feet of space and that "[t]he selected building must comply with the Interagency Security Committee Security Design Criteria for New Federal Office Buildings and Major Modernization Projects as well as other security guidelines, which will be provided during the solicitation for offers process." J.A. 41.

The VA subsequently issued Solicitation for Offers No. VA-101-08-RP-0034 ("SFO") detailing the lease requirements for the Parma Clinic. Section 4.2.7 of the SFO discusses the physical security requirements of the space and is reproduced below:

**4.2.7 Physical Security Requirements**

Lessor shall provide the following physical security measures or features for the spaces or areas as listed below:

1. The Government will determine security standards for facilities and agency space requirements. Security standards will be assessed based upon tenant agency mix, size of space requirement, number of employees, use of the space, location of the facility, configuration of the site and lot, and public access into and around the facility. The Government will designate a security level from Level I to Level IV for each space requirement. The Contracting Officer (or the Contracting Officer's designated representative) will provide the security level designation as part of the space requirement. A copy of the Government's security standards is available at www.oca.gsa.gov. *A single use building over 70,000 square feet will be a Level III Security Requirement.*

J.A. 92–93 (emphasis added). Section 4.2.7 also contains a Physical Security Table, which labels seven spaces within the building with their own applicable security requirements. J.A. 93.

During a pre-bid meeting, a bidder asked for clarification on whether the SFO's Level III security requirement was actually a Level II requirement. On June 3, 2008, the VA issued Amendment #1 to the SFO to clarify this issue and others. Amendment #1 states in part:

**4. Security Level – Clarify whether the project requires Level 2 or 3 security.**

Based upon ISC Standards, the project would be a Level 2, based on 11–150 personnel and a size of 2,500 to 80,000 rentable square feet.

J.A. 192. Amendment #1 did not define "ISC Standards" or reference any documents containing the ISC standards. On June 10, 2008, Premier signed an acknowledgement of receipt of Amendment #1. J.A. 193.

In response to the SFO as amended, Premier submitted a proposed design narrative for the Parma Clinic.  The design narrative described the site development, building, and building systems proposed by Premier, and also considered "at a conceptual level," issues such as configuration, structural systems, and interior design. J.A. 198. The design narrative did not address the physical security requirements described in Amendment #1.  *See generally* J.A. 198–209.

On November 12, 2008, Premier and the VA entered into Lease No. VA-101-08-RP-0034 (the "Lease"), under which Premier was to provide "[a] fully built out space as described, all services, maintenance, operations, alterations and other considerations as set forth in Solicitation for Offers No. VA-101-08-RP-0034 *and all amendments*." J.A. 46 (emphasis added).  The Lease incorporated and attached the SFO, Amendments #1–3 to the SFO, Premier's response to the SFO and Amendments #1–3, and Premier's proposed building plan.  J.A. 47.

On March 3, 2010—nearly one and a half years after execution of the Lease—the VA wrote a memorandum to Premier inquiring about "several areas of concern" that the VA had regarding Premier's first design submittal.  J.A. 359.  The memorandum asked "[h]ow will the Interagency Security Committee (ISC) Security Design Criteria be addressed such as progressive collapse? Refer to SFO section 4.2.7 and amendment #1."  J.A. 360.  In a separate communication, the VA advised Premier to obtain access to the ISC standards and explained that "the project needs to be designed according to the ISC."  J.A. 362.

On March 9, 2010, Premier wrote to ISC to request access to the standards.  The ISC denied Premier's request the following day and informed Premier that release of ISC documents "may only be made to Federal, state, or local government entities," and that the documents had to be requested by a federal contracting officer who has a "need to

know" the information. J.A. 363. The VA obtained copies of three ISC documents and, on March 16, 2010, electronically sent them to Premier, noting that the documents are what Premier "will need for the VA security issues." J.A. 217. The three ISC documents were: (1) ISC Security Design Criteria for New Federal Office Buildings and Major Modernization Projects; (2) ISC Security Standards for Leased Space; and (3) Facility Security Level Determinations for Federal Facilities, An ISC Standard. J.A. 217, 219, 321, 338.

Shortly after the VA sent the ISC documents to Premier, some confusion ensued as to which security standard applied to the Parma Clinic facility. Reversing course on previous communications, the VA instructed Premier to disregard the ISC requirements in the SFO and to incorporate only the requirements as indicated in the latest VA Physical Security Guide. *See* J.A. 365–66. On March 26, 2010, the VA electronically sent to Premier a copy of the VA Life-Safety Protected Design Guide, which it noted "is more straight forward than the ISC and should have been included in the SFO." J.A. 367. On April 2, 2010, the VA reiterated in a memorandum that the facility should be designed "according to the VA Life-Safety Protected Design Manual." J.A. 370. Several months later, however, the VA again changed its position. Specifically, on July 26, 2010, the VA wrote to Premier advising that "[t]he ISC is the design standard, and the facility should be designed with that criteria." J.A. 372.

On October 26, 2010, Premier sought clarification on whether the ISC Level II requirements applied to the entire facility. *See* J.A. 378. Premier's stated understanding was that only the individual spaces listed in Section 4.2.7's Physical Security Table needed to comply with the ISC. Premier noted that there would be significant additional costs associated with applying the ISC standard to spaces beyond those listed in the Physical Security Table and asked if the VA intended to pay for the additional costs.

*See* J.A. 378. The VA responded on October 29, 2010, instructing Premier that the project "must conform to the ISC Level II Security Requirement at no additional cost to the government." J.A. 379. It noted that the ISC standard was "available upon request prior to bid," and that "it pertains to an entire building not individual rooms." J.A. 379. Although Premier disagreed with this position, it eventually designed and constructed the building in accordance with the ISC standards. *See Premier Office Complex of Parma, LLC v. United States*, 134 Fed. Cl. 83, 86 (2017) ("Decision") (citing Complaint ¶ 18, *Premier Office Complex of Parma, LLC v. United States*, 134 Fed. Cl. 83 (2017) (No. 14-1223C) ("Complaint")).

On February 14, 2011, Premier wrote to the VA asking for a determination regarding the Parma Clinic's physical security requirements. On November 1, 2011, Premier's counsel sent a letter to the VA requesting $964,356.40 for additional costs incurred by Premier as a result of the VA's alleged changes to the lease. *See* J.A. 382. According to Premier, the VA's addition of the ISC security requirements "substantially increased" Premier's costs to design and construct the Parma Clinic. J.A. 382. On December 5, 2011, the VA issued a final determination and denied Premier's request for payment. It explained that "the building security requirements were clearly spelled out within the SFO in section 4.2.7 and then clearly confirmed in Amendment #1 prior to the Lessor providing a bid and receiving the award." J.A. 395. On February 11, 2014, Premier's counsel submitted a certified claim for payment to which the VA did not respond. On December 22, 2014, Premier filed the current lawsuit in the Court of Federal Claims, alleging that the VA breached the Lease by directing Premier to perform work outside the scope of the contract and refusing to compensate Premier for the extra costs. *See* Complaint ¶¶ 5–7.

On cross motions for summary judgment, the Court of Federal Claims ruled that the Lease as a whole "provided

that ISC Standard Level II applied to the entire facility." *Decision*, 134 Fed. Cl. at 90. It determined that while Section 4.2.7 itself was latently ambiguous, Amendment #1 resolved the ambiguity as it "clearly requires ISC Level II security for the whole 'project.'" *Id.* at 89–90. The Court of Federal Claims rejected Premier's argument that the ISC standards applied only to the spaces listed in Section 4.2.7's Physical Security Table, explaining that the plain meaning of "project" compels the conclusion that the standards applied to the entire facility. *See id.* at 90. It further noted that "had Premier consulted the ISC Standards in a timely manner, it would have seen this discrepancy and not fallen into the misconception that the ISC Standards only applied to the spaces and areas listed on the table." *Id.* at 89–90. Accordingly, the Court of Federal Claims granted the government's motion for summary judgment and denied Premier's cross motion for summary judgment of liability. *Id.* Premier appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### I

"We review 'the summary judgment of the Court of Federal Claims, as well as its interpretation and application of the governing law, de novo.'" *Hartman v. United States*, 694 F.3d 96, 101 (Fed. Cir. 2012) (quoting *Gump v. United States*, 86 F.3d 1126, 1127 (Fed. Cir. 1996)). The Rules of the Court of Federal Claims ("RCFC") provide that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Contract interpretation is a question of law generally amenable to summary judgment." *Varilease Tech. Grp., Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002). "Whether a contract provision is ambiguous is also a question of law." *NVT Techs., Inc. v. United States*,

370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993)).

## II

The issue before us is whether the Lease requires that the entire Parma Clinic facility conform to ISC Level II. We hold that it does. Amendment #1 was issued prior to execution of the Lease and was expressly incorporated into the Lease; it is part of the contract. *See* J.A. 46–47, 191–93. Any ambiguity that may have existed in Section 4.2.7 was resolved by Amendment #1, which is unambiguous and requires ISC Level II for the "project." The plain meaning of "project" leads us to conclude that the Lease requires ISC Level II for the entire Parma Clinic facility. Premier's work in designing and constructing such a facility is thus within the scope of work of the Lease.

When interpreting a disputed contract provision, we first determine whether the provision is unambiguous, or if it is susceptible to more than one reasonable interpretation. *See McAbee Const., Inc. v. United States*, 97 F.3d 1431, 1434–35 (Fed. Cir. 1996). Our analysis begins with the language of the written agreement. *See NVT Techs.*, 370 F.3d at 1159. "When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *Id.* (citing *McAbee*, 97 F.3d at 1434–35). If a contract provision is clear and unambiguous, the court may not resort to extrinsic evidence to interpret it. *McAbee*, 97 F.3d at 1435. "A contract term is unambiguous if there is only one reasonable interpretation." *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1544 (Fed. Cir. 1993). "To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term," rather, both interpretations must be reasonable. *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999) (citing *Cmty. Heating*,

987 F.2d at 1578). "When the contractual language is unambiguous on its face, our inquiry ends and the plain language of the Agreement controls." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040–41 (Fed. Cir. 2003).

Section 4.2.7 of the SFO addresses the Parma Clinic's physical security requirements. The language in this section suggests some ambiguity, as it refers to physical security requirements in terms of spaces, facilities, and buildings. It states that "[l]essor shall provide the following physical security measures or features for the *spaces or areas* as listed below." J.A. 92 (emphasis added). It then states that "[t]he Government will determine security standards for *facilities* and agency space requirements. Security standards will be assessed based upon . . . location of *the facility*, configuration of the site and lot, and public access into and around *the facility*." J.A. 93 (emphases added). The section continues: "[t]he Government will designate a security level from Level I to Level IV for *each space requirement . . . . A single use building* over 70,000 square feet will be a Level III security requirement." *Id.* (emphases added). Section 4.2.7 then shows a Physical Security Table, which labels seven spaces within the building with their own applicable security requirements. *Id.*

Amendment #1 was issued in part to clarify Section 4.2.7, specifically, to "[c]larify whether *the project* requires Level 2 or 3 security." J.A. 192 (emphasis added). Amendment #1 explains that "[b]ased upon the ISC Standards, the project would be a Level II." *Id.* Premier argues that Amendment #1 "is itself ambiguous" and that it applies only to the seven specific areas identified in Section 4.2.7's Physical Security Table. Appellant Br. 21–22. According to Premier, Section 4.2.7 requires physical security enhancements for only seven areas, so Amendment #1, which clarified Section 4.2.7, should also apply only to those areas. *Id.* at 19, 21–23. The government's position is that Amendment #1 is unambiguous and requires the

entire facility to conform to ISC Level II. Appellee Br. 9–12. We agree with the government.

Amendment #1 clearly requires ISC Level II for the "project." The only reasonable interpretation of this language is that "project" refers to the entire Parma Clinic facility. Because Amendment #1 was issued to clarify the seemingly ambiguous Section 4.2.7, it is reasonable to interpret Amendment #1 as applying to the entire facility. This reading clarifies all of Section 4.2.7—the facility, spaces, and building must all conform to ISC Level II. This interpretation is consistent with the plain meaning of the term "project," which is defined as "[a]n individual or collaborative enterprise that is carefully planned to achieve a particular aim." OED, *Project*, English Oxford Living Dictionaries (Dec. 13, 2018, 12:01 PM), https://en.oxforddictionaries.com/definition/project. We agree with the Court of Federal Claims that the aim of the collaborative enterprise here is the construction and lease of the Parma Clinic facility. *See Decision*, 134 Fed. Cl. at 90. To interpret Amendment #1 as Premier proposes would mean that "project" refers to only a subset of spaces within the collaborative enterprise. This is an unreasonable reading. We conclude that Amendment #1 unambiguously requires the entire Parma Clinic facility to conform to ISC Level II.

Premier was on notice prior to the signing of the Lease that the ISC standards would be required. Amendment #1 issued on June 3, 2008, Premier signed an acknowledgement of receipt of Amendment #1 on June 10, 2008, and the parties signed the Lease, which expressly incorporated Amendment #1, on November 12, 2008. *See* J.A. 47, 191–193. There is no evidence in the record that Premier ever inquired about the scope and applicability of the ISC standards before it signed the Lease. It was not until March 2010—nearly one-and-a-half years after the Lease was signed—that Premier attempted to access the ISC standards for the first time. It took the VA only six days to

deliver the standards to Premier after Premier's initial request was denied. *See* J.A. 217, 363–64.

Had Premier requested the standards earlier—ideally before it even signed the Lease—it would have discovered that ISC security levels are determined based on characteristics of the *facility*, and not individual spaces. One of the ISC documents that the VA sent to Premier instructs that "[a] Level II *facility* has between 11 and 150 federal employees. In addition, the *facility* likely has: From 2,500 to 80,000 square feet." J.A. 332 (emphases added). Another ISC document sent to Premier contains a chart explaining how "ISC *Facility* Security Level[s]" are determined. *See* J.A. 347 (emphasis added). It shows that "Facility Population" and "Facility Size" are among the relevant factors that are used to determine the applicable "Facility Security Level" ranging from I to IV. *See* J.A. 347.

We recognize that after the Lease was signed, the VA made inconsistent statements about whether the ISC standards applied. These statements do not change our conclusion that there is only one reasonable way to interpret the Lease. In the end, the VA did communicate to Premier that the ISC standards applied to the Parma Clinic. *See* J.A. 372.

Because the Lease as a whole requires ISC Level II for the entire Parma Clinic facility, we hold that the Court of Federal Claims properly determined that Premier's work in providing such a facility is within the scope of work of the Lease.

CONCLUSION

We have considered Premier's remaining arguments and find them unpersuasive. We affirm the judgment of the Court of Federal Claims granting the government's motion for summary judgment and denying Premier's cross motion for summary judgment of liability.

**AFFIRMED**

COSTS

No costs.