NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**LEBOLO-WATTS CONSTRUCTORS 01 JV, LLC,**
*Appellant*

**v.**

**SECRETARY OF THE ARMY,**
*Appellee*

---

2021-1749

---

Appeal from the Armed Services Board of Contract Appeals in Nos. 59740, 60378, 60459, 60507, 60508, Administrative Judge J. Reid Prouty, Administrative Judge Reba Page, Administrative Judge Richard Shackleford.

---

Decided:  February 18, 2022

---

HERMAN MARTIN BRAUDE, Braude Law Group, P.C., Rockville, MD, argued for appellant.

DANIEL B. VOLK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee.  Also represented by BRIAN M. BOYNTON, MARTIN F. HOCKEY, JR., PATRICIA M. MCCARTHY.

---

Before LOURIE, BRYSON, and CUNNINGHAM, *Circuit Judges*.

BRYSON, *Circuit Judge*.

In this appeal, Lebolo-Watts Constructors 01 JV, LLC, ("Lebolo") seeks compensation for costs associated with the performance of a contract to construct a satellite communications operations center at Fort Meade, Maryland. The appeal includes a claim by Lebolo on its own behalf and pass-through claims that Lebolo submitted on behalf of two of its subcontractors, Worch Electric Inc. ("Worch") and Warner Mechanical Corporation ("Warner"). The Armed Services Board of Contract Appeals denied compensation as to all three claims, and this appeal followed. We affirm.

I

A

On November 24, 2010, the U.S. Army Corps of Engineers published a contract solicitation for construction of the Wideband Satellite Communication Operations Center ("WSOC") at Fort Meade, Maryland. J.A. 379. In addition to the construction of the WSOC building, the contract called for the construction of a new electrical substation. J.A. 2. The new substation would receive power from existing electrical switchgear in another building known as "Building 8905" and would provide power to the WSOC building. *Id.*

The solicitation for the WSOC contract included Drawing No. EP 601, which depicted the existing switchgear in Building 8905. J.A. 10478. That drawing was subsequently revised, and on December 20, 2010, it was issued as part of an amendment to the solicitation. J.A. 478. The drawing indicated that the contractor was to use spare cubicles five and ten in Building 8905 to connect to the

existing switchgear and to provide power to the new substation.  J.A. 10435.

Drawing No. EP 601 depicted two circuit breakers, one in cubicle five and one in cubicle ten, in bold font.  *Id.*  Other circuit breakers depicted in the drawing were shown in light gray font.  *Id.*  As found by the Board, the typical convention is that bolded items on a drawing represent new work to indicate to the contractor what is within the contract's scope of work.  J.A. 79–80, 11687.

In addition to the bolded items, the drawing included four notes.  The first note relevant here, note two, required the contractor to "furnish and install 1 set of 3 #2/0-AWG-C and 1 #6-AWG-G."  J.A. 10435.  The second note relevant here, note four, stated that the "circuit breaker installed in the existing switchgear shall be compatible with the existing switchgear," and that such work should be included "in the coordination study."  *Id.*  Neither the drawing nor the contract specifications explicitly stated whether the government or the contractor was to furnish the circuit breakers to be used in cubicles 5 and 10.

Lebolo submitted a bid and was ultimately awarded the WSOC contract.  In January 2013, after work had begun on the contract, representatives of Lebolo and the government visited Building 8905.  During the visit, it became clear that the government's position was that Lebolo was responsible for furnishing the two circuit breakers referred to in Drawing No. EP 601.  J.A. 11679.  On March 15, 2013, Lebolo directed one of its contractors, Enterprise Electric Company ("Enterprise"), to "furnish and install th[o]se breakers."  J.A. 2370.  Enterprise did not obtain the circuit breakers and deliver them to Building 8905 until June 11, 2013, causing a delay in the project.  J.A. 7966.

Additional delays continued to impact the project after the delivery of the circuit breakers.  For instance, Lebolo repeatedly notified Worch of deficiencies in its work from May through December 2013.  J.A. 36–39.  Lebolo also

charged Enterprise with having caused delay on the project starting in May 2013 and running through April 2014. J.A. 48–49; *Lebolo-Watts Constructors 01 JV, LLC*, ASBCA Nos. 59740, 60378, 60459, 60507, 60508, Transcript of Oct. 11, 2017, Hearing at 172–74. In addition, it was discovered that the relays in the existing switchgear were not compatible with the new circuit breakers. The government then obtained and furnished new relays that were compatible with the circuit breakers, resulting in a delay in contract completion. J.A. 40–41, 11709. Another period of delay of 18 days resulted from issues with the existing differential relays in Building 8905 and out-of-phase conductors at the existing substation. *Lebolo-Watts Constructors 01 JV, LLC*, ASBCA Nos. 59740, 60378, 60459, 60507, 60508, R4, tab 338 ("Ockman Rep.") at 40–42. Permanent power was finally made available at the new substation on December 19, 2013. J.A. 48.

Throughout the contract, Lebolo negotiated several contract modifications with the government to extend the completion date on the contract and to compensate Lebolo for various delays. In one of those modifications, Modification No. A00016, the government compensated Lebolo for, among other things, installing the new relays that the government furnished for use in the existing switchgear. J.A. 5453. That modification included a release for all claims "on behalf of the Contractor and its Subcontractors and Suppliers . . . for all delays related thereto." *Id.* at 5454.

Another modification, Modification No. P00030, provided Lebolo monetary compensation and a time extension for various delays associated with "power delays and substation changes." J.A. 1112. The release language in that modification was very similar to the release language in Modification No. A00016, except that Modification No. P00030 did not specifically reference the claims of Lebolo's

subcontractors.[1]  *Id.*  A contemporaneous email exchange between Lebolo and the government indicated that Lebolo intended to reserve the rights of its subcontractors to bring a delay claim for the issues addressed by Modification No. P00030.  *See* J.A. 5979–83.

B

After the completion of the project, Lebolo raised several claims to the contracting officer.  When those claims were denied or not acted upon, Lebolo appealed to the Armed Services Board of Contract Appeals.

Three claims are relevant to this appeal.  Lebolo submitted one claim seeking compensation for the circuit breakers that it furnished for use in Building 8905.  In the other two claims, which Lebolo submitted on behalf of Worch and Warner, Lebolo sought compensation for losses suffered by those subcontractors due to the delay in establishing permanent power at the new substation.

With respect to Lebolo's claim regarding the circuit breakers, the Board held that the contract required Lebolo to provide the circuit breakers, J.A. 81, but contained a patent ambiguity concerning the requirements for the circuit breakers to be used in Building 8905. J.A. 87.  Because the ambiguity was patent, the Board held that Lebolo had a duty to inquire regarding the ambiguity before placing its bid.  *Id.*  Lebolo did not make such an inquiry, and therefore the Board resolved the ambiguity against Lebolo.  *Id.*

---

[1]    The release language in Modification No. P00030 read, in part, "It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor for all costs and markups directly or indirectly attributable for the change ordered, for all delays related thereto, for all extended overhead costs, and for performance of the change within the time frame stated." J.A. 1112.

As a result, the Board held that Lebolo was responsible for the circuit breakers and was not entitled to compensation for furnishing them or for the delay resulting from the time required to obtain them.

With respect to the pass-through subcontractor claims seeking recovery for the delay in providing permanent power to the project, the Board reached several conclusions. First, the Board found that, to the extent the subcontractors' claims were seeking compensation for delay associated with the procurement of the circuit breakers, that delay was attributable to Lebolo and not the government, because the circuit breakers were the responsibility of Lebolo. J.A. 103.

Second, as to delay that was not associated with the circuit breakers, the Board found that Lebolo had waived the rights of its subcontractors to raise delay claims regarding the provision of permanent power when Lebolo agreed to Modification No. P00030. J.A. 98. The Board held that the release language in that modification, which waived the rights of "the Contractor . . . for all delays related thereto," was unambiguous, because subcontractors are not in privity of contract with the government and can raise pass-through claims only through the general contractor. J.A. 98 & n.50. According to the Board, because the subcontractors' rights were waived in Modification No. P00030, the government was not required to pay compensation for any delay associated with the provision of permanent power. J.A. 99.

Third, the Board found that, even if the subcontractors' rights were not waived, those two claims lacked merit because there was concurrent contractor-caused delay throughout the relevant period. Specifically, the Board found that four categories of contractor activity resulted in a total of 353 days of delay on the project: "late finish of masonry walls; slow progress with electrical work; late commissioning of the substation; and slow progress with

testing/late substantial completion as-built schedule." J.A. 29–30. In other words, the entirety of the delay on the project was at least partially attributable to the contractor because the project was delayed in total by 353 days. J.A. 61. The Board concluded that the contractors' actions precluded recovery because Lebolo and its subcontractors were "responsible for concurrent and non-concurrent delay" during the periods of delay Lebolo asserted. J.A. 115.

Following the Board's denial of those three claims, Lebolo appealed to this court.

II

We review the Board's conclusions of law de novo; we may set aside the Board's factual findings if they are "fraudulent, arbitrary, or capricious"; "so grossly erroneous as to necessarily imply bad faith;" or "not supported by substantial evidence." *Sharp Elecs. Corp. v. McHugh*, 707 F.3d 1367, 1371 (Fed. Cir. 2013); 41 U.S.C. § 7107(b). Contract interpretation is a question of law. *Premier Off. Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019).

A

Lebolo first argues that the Board erred in determining that the contract required Lebolo to furnish the circuit breakers used in Building 8905. In Lebolo's view, Drawing No. EP 601 unambiguously requires the government to furnish the circuit breakers. In the event that the drawing is deemed ambiguous, Lebolo argues, the ambiguity is latent and the doctrine of *contra proferentem*[2] applies. We

---

[2] Under the doctrine of *contra proferentem*, a contract provision that is latently ambiguous is construed against the drafter. *HPI/GSA 3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004). As applied here, if the contract were deemed latently ambiguous, the contract would be

conclude that the contract was patently ambiguous as to the circuit breakers.

There are several indications that the contract required Lebolo to furnish the circuit breakers. First, the circuit breakers are depicted in bold font in Drawing No. EP 601. J.A. 10435. The Board accepted the government's assertion that the use of bold markings is a "traditional design convention" that indicates "new work for the contractor." J.A. 79–80. We sustain the Board's finding that the depiction of the circuit breakers in bold suggested that the circuit breakers represented new work to be done by the contractor.

Second, note four on Drawing No. EP 601 provides that the "circuit breaker installed in the existing switchgear shall be compatible with the existing switchgear." J.A. 10435. Lebolo points to the past tense use of "installed" as evidence that the circuit breakers would already be provided in the spare cubicles. Appellant's Br. 42. However, the imperative "shall be" suggests that some action is required on the part of the contractor. If the circuit breakers had already been installed, there would be no need to determine whether the existing circuit breakers were compatible with the existing switchgear, and note four would be pointless.

Third, when Lebolo solicited bids from potential subcontractors, one of the bidders, 1st Electric Inc., included the circuit breakers in its bid. J.A. 10495. Lebolo argues that 1st Electric's bid referred to "existing unused breakers in the 'spare' cubicles" and therefore did not include furnishing new circuit breakers. Appellant's Br. 48–49. The Board, however, found that "1st Electric did include the[]

---

construed to require the government, which drafted the solicitation, to furnish the circuit breakers used in Building 8905.

breakers in its bid." J.A. 13. That finding is consistent with the language in 1st Electric's bid and is thus supported by substantial evidence.

Although the evidence supporting the government's interpretation of the contract is strong, there is some evidence in favor of Lebolo's interpretation. For instance, note 2 of Drawing No. EP 601 uses the phrase "furnish and install" to identify other equipment that Lebolo was responsible for furnishing, but Drawing No. EP 601 did not use that language to refer to the circuit breakers. J.A. 10435. Additionally, the contract specifications described other circuit breakers that were to be furnished and installed by Lebolo but did not describe the circuit breakers to be used in Building 8905. *See, e.g.*, J.A. 9658. Finally, three of the four electrical subcontractors that submitted bids to Lebolo apparently did not include the circuit breakers in their bids. *See* J.A. 13.

In the end, we conclude that the contract is ambiguous with respect to the obligation to provide the circuit breakers. That conclusion requires us to address whether the ambiguity is latent or patent. As the Board explained, a patent ambiguity is one that is obvious, gross, or glaring, such that the contractor has a duty to inquire about it. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1162 (Fed. Cir. 2004).

Lebolo cites *Mountain Home Contractors v. United States*, 425 F.2d 1260 (Ct. Cl. 1970), for the proposition that "an ambiguity cannot be patent if it is so small or infinitesimal that there is no competitive advantage being taken by a prospective bidder" who remains silent in order to bid a lower amount. Appellant's Br. 49–50. In Lebolo's view, because the circuit breakers represented a very small portion of the total contract price, the ambiguity regarding who was to furnish the circuit breakers cannot be patent. We disagree that *Mountain Home* compels that result.

In *Mountain Home*, the contract at issue was for the construction of 300 housing units. *Mountain Home*, 425 F.2d at 1261. The contract provided for the installation of kitchen exhaust fans "where shown," yet the notations on the drawings provided that the exhaust fans were to be bid as an alternative, and there was no alternative item listed in the specifications for kitchen exhaust fans. *Id.* at 1263. The court observed that the cost of the exhaust fans was $19,764, while the contract price was $4,918,600. *Id.* at 1264. However, the court noted that the low cost of the fans relative to the contract price was "not the sole determinative factor" in its holding that the ambiguity was latent. *Id.* The overall question, in the court's view, was whether the ambiguity was "glaring or substantial" such that it "impose[d] upon plaintiff the duty to seek clarification from the government." *Id.* The relatively low cost of the fans was simply evidence that the ambiguity was not glaring or substantial.

Here, by contrast, the Board held that any ambiguity that existed in the contract with respect to the circuit breakers was patent because of the importance of the circuit breakers to the overall project. Although the Board acknowledged the relatively low cost of the circuit breakers as compared to the total contract price, it noted that for certain contract items the "significance" of the item "may vastly exceed the purchase price." J.A. 84 (emphasis omitted). The Board pointed to the fact that a "critical delay" resulted from the failure to procure the circuit breakers as evidence of the circuit breakers' significance. *Id.*[3]

---

[3] Another difference between this case and *Mountain Home* is that in *Mountain Home* the court recognized that it was reasonable for the contractor to conclude that many of the housing units were not intended to have exhaust fans. *Mountain Home*, 425 F.2d at 1264. Here, by contrast, no one could reasonably allege that power could

For its part, Lebolo argues that the Board's analysis regarding the importance of the circuit breakers is impermissibly based on hindsight. However, the information available at the time should have given rise to an inference that the breakers were significant. For instance, the contract provided that the new substation being constructed by Lebolo would obtain its high voltage power from the existing switchgear located in Building 8905. J.A. 2. For that reason, it would have been clear that not having circuit breakers in the spare cubicles would result in a delay in providing power to the new substation. And the question of who was required to furnish the circuit breakers should have been apparent to Lebolo given that 1st Electric included the new circuit breakers in its bid to subcontract the electrical work, and given that note four on Drawing No. EP 601 was specifically called out in an amendment to the solicitation.

We therefore conclude that the ambiguity regarding the circuit breakers was patent. Because the ambiguity was patent, Lebolo had a duty to inquire about the ambiguity. *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1313 (Fed. Cir. 2016). And because of its failure to do so, the ambiguity was properly construed against Lebolo. *See id.* Accordingly, Lebolo was responsible for furnishing and installing the two circuit breakers in the spare cubicles in Building 8905, and it is not entitled to compensation for the cost of the circuit breakers or the delay associated with procuring them.

## B

Lebolo next argues that its subcontractors Worch and Warner are entitled to compensation for government-caused delays associated with the provision of permanent

---

have been provided to the new substation without the circuit breakers in the spare cubicles in Building 8905.

power at the new substation. As a preliminary matter, to the extent that the pass-through subcontractor claims allege delays associated with the procurement of circuit breakers for use in Building 8905, those claims fail because the circuit breakers were Lebolo's responsibility. That delay is therefore attributable to Lebolo and not to the government.

Lebolo argues that even if it was properly charged with responsibility for the circuit breakers, the Board erred in finding that Modification No. P00030 waived the rights of Lebolo's subcontractors to pursue claims regarding other delays associated with the provision of permanent power. We need not reach that issue because, even if those claims were not waived, the subcontractors are not entitled to compensation for those delays, for several reasons.

First, the pass-through claims that Lebolo submitted on behalf of Worch and Warner do not allege any delays other than delays associated with the provision of the circuit breakers. Both Worch and Warner submitted letters describing their claims to Lebolo, and Lebolo forwarded those letters to the contracting officer. J.A. 996–1001 (Worch letter), 2158–62 (Warner letter). Both letters focused exclusively on the delays associated with procuring new circuit breakers for Building 8905, and no other issues. The government recognized as much when it requested more information from Lebolo regarding the two subcontractor claims. *See* J.A. 1135–36, 2181–82. However, as Lebolo acknowledged at oral argument, Lebolo never responded to those requests. *See also* J.A. 2184–85. Accordingly, we do not construe the claims brought on behalf of Warner and Worch as encompassing any delays not attributable to the procurement and installation of the circuit breakers.

Second, even if the pass-through claims were construed to cover delays other than those attributable to the circuit breakers, those claims would not be compensable because

there was concurrent contractor-caused delay throughout the period in which the alleged government-caused delays occurred. In order to recover on a delay claim, a contractor must establish that "the government's actions are the sole proximate cause of the contractor's additional loss, and [that] the contractor would not have been delayed for any other reason during that period." *Triax-Pac. v. Stone*, 958 F.2d 351, 354 (Fed. Cir. 1992) (emphases omitted).[4]

The circuit breakers were delivered on June 11, 2013, yet the subcontractor claims allege delay for the entire period from February 4, 2013, until December 22, 2013. J.A. 1000, 2162. During that period, however, there were a number of extended periods of delays that were attributable to the contractor.

On June 12, 2013, Lebolo employee Mike Boettcher emailed Worch complaining that Worch's electrical work was "months behind schedule." J.A. 37. From that time through December 6, 2013, Lebolo expressed concern to Worch regarding its delay on the project at least ten additional times. *See id.* at 37–39. Lebolo also later contacted Enterprise and indicated that there was contractor-caused delay beginning in May 2013 and continuing through at

---

[4] We note that the requirement stated in *Triax-Pacific* applies to a claim brought under the contract's suspension clause, whereas here Lebolo brought its subcontractor claims under the "Changes Clause." J.A. 996, 2158. However, when the claim focuses on "delay of the contract, as opposed to a change in the work to be performed in the contract, it is the Suspension clause rather than the Changes clause which applies." *Triax-Pac.*, 958 F.2d at 354. Here, to the extent that the claims focus on delay, not on a change in the work to be performed, the claims should be treated as brought under the suspension clause. *See id.*

least April 2014.  J.A. 48–49; Transcript of Oct. 11, 2017, Hearing 172–74.

There was a 31-day period from July 2, 2013, to August 2, 2013, that Stuart Ockman, the government's expert, recognized as government-caused delay associated with the replacement of relays in the spare cubicles in Building 8905.  Ockman Rep. 32.  As Mr. Ockman noted, "replacing the relays was initially the Government's responsibility." *Id.*  However, the execution of Modification No. A00016 waived all delay claims relating to the installation of new relays for both Lebolo-Watts and its subcontractors.  *Id.*; J.A. 5453–54.  The delay associated with the installation of the new relays in Building 8905 is therefore also not compensable.

Mr. Ockman also recognized an 18-day period from November 21, 2013, to December 9, 2013, as government-caused delay.  Ockman Rep. at 32, 40–42.  Mr. Ockman found that delay to be resolved by Modification No. P00030, which purportedly resolved all delay damages on the contract.  *Id.* at 32.

Lebolo argues that Modification No. P00030 was purposely made inapplicable to the subcontractors and therefore did not resolve the subcontractors' delay claims.  Even accepting Lebolo's argument on that point, however, the subcontractors' claims fail because of concurrent delay attributable to the contractor, even with respect to the 18-day period in November and December 2013.

The communications from Lebolo to Worch and Enterprise support an inference that delay attributable to the contractor continued during that 18-day period.  That inference accords with the Board's finding that 353 days of delay, the entirety of the period of delay in the performance of the contract, was attributable to the contractor.  And we note that on appeal Lebolo has not challenged any of the Board's fact-findings with respect to the periods of concurrent contractor delay.  We therefore hold that the Board's

finding of concurrent delay is supported by substantial evidence.  Accordingly, the government was not the "sole substantial cause" of delay at any point between June 11, 2013, and December 22, 2013.[5]  *Triax-Pac.*, 958 F.2d at 354.

## III

In summary, the contract contained a patent ambiguity regarding whether Lebolo was required to furnish the two circuit breakers in Building 8905.  Because Lebolo did not inquire about the ambiguity, it was Lebolo's responsibility to provide the circuit breakers, and any delay associated with furnishing the circuit breakers is therefore not compensable.  Lebolo also cannot prevail on its pass-through subcontractor delay claims because those claims did not allege delays other than those associated with the circuit breakers.  And, in any event, there was concurrent delay throughout the period for which Worch and Warner seek compensation.  We therefore affirm the decision of the Board.

**AFFIRMED**

---

[5]    Lebolo also argues that the execution of Modification No. P00030 is evidence that the government was responsible for the delay associated with the provision of permanent power.  Appellant's Br. 63–64 (citing *L.C. Gaskins Constr. Co.*, ASBCA No. 58550, 2018 WL 1098079 (Feb. 14, 2018)).  However, that argument does not account for the fact that there was concurrent contractor-caused delay throughout the relevant time period and that Lebolo and its subcontractors are therefore not entitled to compensation for that period of delay.