NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**WSP USA SOLUTIONS INC.,**
*Appellant*

**v.**

**SECRETARY OF THE ARMY,**
*Appellee*

---

2023-1256

---

Appeal from the Armed Services Board of Contract Appeals in No. 62674, Administrative Judge J. Reid Prouty, Administrative Judge Richard Shackleford, Administrative Judge Kenneth David Woodrow.

---

Decided:  February 21, 2025

---

SCOTT ARNOLD, Blank Rome LLP, Washington, DC, argued for appellant.  Also represented by DAVID LEE BODNER, STEPHANIE HARDEN, DAVID MICHAEL NADLER, ADAM SETH PROUJANSKY.

PATRICK ANGULO, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee.  Also represented by BRIAN

2       WSP USA SOLUTIONS INC. v. SECRETARY OF THE ARMY

M. Boynton, Patricia M. McCarthy, Corinne Anne Niosi.

————————————

Before Prost, Taranto, and Hughes, *Circuit Judges*.

Hughes, *Circuit Judge*.

WSP USA Solutions Inc., a private contractor, appeals the final decision of the Armed Services Board of Contract Appeals that WSP was properly compensated for its services rendered pursuant to a contract with the United States Army Corps of Engineers. WSP submitted a certified claim under the Contract Disputes Act, 41 U.S.C. §§ 7101–09, alleging costs it was owed by the government because of incorrect pricing for services performed under three specific task orders. The Contracting Officer determined the services were correctly priced and denied the claim. WSP appealed the Contracting Officer's final decision, and the Board concluded the underlying contract unambiguously provided that pricing for the contested task orders was determined by the time the orders were first issued and denied the appeal on this basis. Because we conclude the Board did not properly consider the contract in its entirety as modified by the later-issued task orders in evaluating each of the parties' purported unambiguous interpretations of the contractual pricing scheme and reject both parties' arguments that the pricing scheme is unambiguous, we vacate the Board's finding that the contract was unambiguous and remand for proper investigation of the contract terms, including modifications made to task orders issued pursuant the contract.

I

The pricing dispute underlying this appeal turns on a question of contract interpretation. The question raised on appeal is whether the fixed price for work performed under a task order is established by the date the task order is issued or by the date on which the work is actually performed

under the task order when such work extends beyond its initial expected period of performance and into a later contract year. Before addressing the merits, we will first describe the overall contract, the provision at issue, and the underlying series of events relevant to this dispute.

## A

On October 22, 2014, the United States Army Corps of Engineers awarded requirements contract No. W911WN-15-D-0001 to WSP USA Solutions Inc.[1] Under the contract, WSP would provide temporary emergency power services required for federally declared emergencies. Specifically, WSP would provide emergency support to the Federal Emergency Management Agency (FEMA) Region IX (Arizona, California, and Nevada), Region X (Idaho, Oregon, and Washington), and certain areas outside the continental United States (Puerto Rico, US Virgin Islands, Alaska, Hawaii, Guam, and American Samoa). J.A. 10016. The

---

[1]    The Board's final decision described the contract as "an indefinite quantity indefinite delivery" (IDIQ) contract instead of an indefinite delivery requirements contract. J.A. 2. While the contract explicitly includes the Requirements Clause at subsection 52.216-21 of the Federal Acquisition Regulation, *see* J.A. 10058–59, it does not include the IDIQ Clause at subsection 52.216-22 of the Federal Acquisition Regulation. To the extent the record includes references to an indefinite delivery indefinite quantity requirements contract, we note that subsection 16.501-2(a) of the Federal Acquisition Regulation specifically defines indefinite-quantity contracts and requirements contracts as two separate and distinct "types of indefinite-delivery contracts." As such, we find substantial evidence supports a finding that the contract was a requirements contract and not an indefinite quantity contract.

initial contract was for $95,000,000 and had a one-year base period and four one-year option periods. *See* J.A. 10001–11.

The contract is divided into three parts. *See* J.A. 10001. Part I of the contract contains the Schedule, which consists of Sections A–C and E–G. J.A. 10001–55. Relevant here is Section B (Supplies or Services and Prices/Costs); Section C (Description/ Specs/ Work Statement); and Section F (Deliveries or Performance). Part II of the contract consists of Section I (Contract Clauses), which contains the specific Federal Acquisition Regulation (FAR) clauses that are incorporated into the contract by either reference or full text. J.A. 10056–78. Two FAR clauses are relevant here: FAR 52.216-21 (Requirements) subsection (f) and 52.216-21 (Ordering). Part III of the contract is Section J (List of Documents, Exhibits and Other Attachments), which contains additional documents applicable to the contract. J.A. 10079–84. Relevant to this appeal, Section J includes a Rate Schedule document with pricing details.

Section B outlines the specific "Supplies or Services and Prices" to be provided under the contract. The contract's required supplies and services are divided into two basic categories: "ACI[2] Emergency Power"[3] and

---

[2] As defined in the contract's Performance Work Statement (PWS), an Advanced Contract Initiative (ACI) is "[t]he process of having a contract in place prior to a disaster to permit quick and immediate response." J.A. 10016–17.

[3] The contract line-item numbers for ACI Emergency Power cover the contractor's provision of "all labor, transportation, equipment, materials supervision, and required internal logistic support to perform generator set activities in support of [certain] FEMA regions . . . as stated in the [PWS]." J.A. 10002.

"Readiness and Preparedness."[4] Section B structures the contract around ten firm-fixed price (FFP) contract line-item numbers (CLINs): two for the initial Base Year and two each for the four exercisable option years (OY). *See* J.A. 10002–11. CLINs 0001, 1001, 2001, 3001, and 4001 cover ACI Emergency Power for the Base Year and the four option years, respectively. *See* J.A. 10002, 10004, 10006, 10008, 10010. CLINs 0002, 1002, 2002, 3002, and 4002 cover Readiness and Preparedness for the Base Year and the four option years, respectively. *See* J.A. 10003, 10005, 10007, 10009, 10011. Section B also specifies the applicable period of performance for each CLIN. "The period of performance for the Base Year will be a period of one year from the date of the contract award," J.A. 10002, 10003, and "[t]he period of performance for [each] option will be a period of one year upon expiration of [the prior] year," J.A. 10004–11. The exact dates of the period of performance for each CLIN are set forth in Section F of the contract:

CLIN 0001 and 0002 (*i.e.*, base year): Oct. 22, 2014–Oct. 21, 2015

CLIN 1001 and 1002 (*i.e.*, OY 1): Oct. 22, 2015–Oct. 21, 2016

CLIN 2001 and 2002 (*i.e.*, OY 2): Oct. 22, 2016–Oct. 21, 2017

---

[4] The contract line-item numbers for Readiness and Preparedness "cover[] the submission and updating of specific plans and reports, coordination with government agencies on the movement of personnel and equipment when necessary, and readiness activi[ti]es that will be described in the task order scope of work and in accordance with the [PWS] of the contract" and in support of certain FEMA regions. J.A. 10003.

CLIN 3001 and 3002 (*i.e.*, OY 3): Oct. 22, 2017–Oct. 21, 2018

CLIN 4001 and 4002 (*i.e.*, OY 4): Oct. 22, 2018–Oct. 21, 2019

*See* J.A. 10051–52.

Section B of the contract further specifies pricing details for the each CLIN. Section B specifies both a Unit Price and a Not to Exceed (NTE) amount for each FFP CLIN. The NTE amount sets the ceiling for the maximum cost of supplies or services that can be provided under a given CLIN. The Unit Price and NTE amount for Readiness and Preparedness was fixed at $15,000 for the Base Year as well as each subsequent option year. *See* J.A. 10003, 10005, 10007, 10009, 10011 (CLINs 0002–4002). The Unit Price and NTE amount for ACI Emergency Power for the Base Year is "$94,985,000 which is the total maximum value of the contract." J.A. 10002 (CLIN 0001). Conversely, the Unit Price and NTE amount for ACI Emergency Power for the subsequent option years is listed as $0 but provides that "[t]he total [NTE] amount will be the unexpended amount remaining from the [prior] year minus the $15,000.00 from" the corresponding Readiness and Preparedness CLIN. *See* J.A. 10004, 10006, 10008, 10010 (CLINs 1001–4001). Each CLIN in Section B also states, "THE CONTRACTOR SHALL PROVIDE PRICING IN ACCORDANCE WITH THE NARRATIVE IN SECTION B AND THE CORRESPONDING RATE SCHEDULE INCLUDED AS ATTACHMENT 1, WHICH WILL BE INCLUDED IN THE CONTRACT." J.A. 10002–11.

The Section B includes a Rate Schedule Narrative that identifies five specific categories of FFP line items: 1) Line Item 0002 for Readiness and Preparedness; 2) Line Items L01 to Lxx for Labor Rates; 3) Line Items E01 to Exx for Equipment Rates; 4) Line Items ME01 to MExx for Mobilization and Demobilization Equipment Costs; and 5) Line Items P01 to P11 for Parts for Servicing Generators. *See*

J.A. 10011–13. The corresponding Rate Schedule, which is included in Section J as an attachment to the contract, sets forth the exact price for each of these specified FFP line items based on the relevant contract year (*e.g.*, Base Year, OY1, OY2, etc.).[5] *See* J.A. 10081–84.

Section C of the contract contains the Performance Work Statement (PWS) which states the contract's general purpose and specifications and describes relevant contract terms and provisions. *See* J.A. 10016. In addition to outlining "the basic Contractor requirements for 3 phases of work"—"Mission Readiness, Mission Mobilization, and Mission Execution . . . with the bulk of the work being performed under the Mission Execution Phase"—the PWS also details the procedures for furnishing supplies and services under the contract. J.A. 10016, 10021. Specifically, the PWS states "[a]ll Government directed phases of work shall be accomplished . . . through the issuance of a Task Order" and "[e]ach Task Order will be issued as a 'Not to Exceed' dollar value." J.A. 10021. The PWS defines a Task Order as "[a] contract issued by a Contracting Officer that provides legal authorization for [WSP] to perform work under this contract." J.A. 10021. In "instances where the Government will have [WSP] adjust the assets initially deployed . . . [a] proposal . . . will be negotiated and incorporated into the resulting task order . . . [and a]ny additions in [WSP] assets (labor and/or equipment) must be handled by modifications to the Task Order." J.A. 10021. Additionally, Section C of the contract prohibits WSP from "exceed[ing] the [NTE] amount stated in the task order"

---

[5]     Unlike the other FFP line items, the price for Line Item 0002, Readiness and Preparedness ($15,000), is set forth in CLINs 0002–4002, and not the Rate Schedule. *See* J.A. 10003, 10005, 10007, 10009, 10011.

and threatens demobilization unless the task order's funding is increased. J.A. 10021.

Section I incorporates certain FAR clauses into the contract. Relevant to this appeal are FAR 52.216-18 (Ordering) and FAR 52.216-21 (Requirements). *See* J.A. 10058–59. The Ordering Clause provides details related to the furnishing of supplies and services through the issuance of task orders, and the Requirements Clause elaborates on the details relating to the government's ordering—and the contractor's delivery or performance—of the supplies and services. The Requirements Clause also contains a subsection that outlines the parties' "rights and obligations with respect to" orders "issued during the effective period of this contract and not completed within that period" (*i.e.*, completed after the contract has expired). J.A. 10059; FAR 52.216-21(f).

B

On October 22, 2014, USACE awarded WSP the $94,985,500 requirements contract at issue here. J.A. 10002. The contract was set to expire at the end of the initial Base Year on October 21, 2015 "unless extended in accordance with FAR Clause 52.217-9 'Option to Extend the Term of the contract.'" J.A. 10058. This clause specifies that "[t]he Government may extend the term of this contract by written notice to the contractor within five days; provided that the Government gives the contractor a preliminary written notice of its intent to extend at least 60 days before the contract expires." J.A. 10059. The clause further states "[t]he total duration of this contract, including the exercise of any options . . . cannot exceed five years." J.A. 10059–60. USACE exercised three of the four available options to extend. On August 28, 2015, USACE exercised the first option year (OY1), which began on October 22, 2015 and extended the contract's expiration date to October 21, 2016. J.A. 6. On September 14, 2016, the USACE exercised the second option year (OY2), which

began on October 22, 2016 and extended the contract's expiration date to October 21, 2017. J.A. 7. On August 16, 2017, USACE exercised the third option year (OY3), which began on October 22, 2017 and extended the contract's expiration date to October 21, 2018. J.A. 7.

On or about September 6, 2017—before the expiration of the contract's OY2 term and only a few weeks after USACE exercised OY3—Hurricane Irma caused widespread damage in the U.S. Virgin Islands (USVI) and Puerto Rico. J.A. 7. Less than two weeks later, Hurricane Maria made landfall as a Category 5 storm in the USVI and as a Category 4 storm in Puerto Rico. Both hurricanes caused extensive damage to the regions, resulting in the destruction of electrical grids and total power loss. J.A. 7.

In response to these two emergency disasters, USACE made multiple contract modifications. In a first set of modifications, USACE transferred more than $85,000,000 in funds from OY3's NTE ceiling (*i.e.*, CLIN 3001) to OY2's NTE ceiling (*i.e.*, CLIN 2001), *see* J.A. 10342, 10352, 10532, 10935. In a second set of simultaneous modifications, USACE issued three task orders over sixteen days. The first task order, TO W911WN17F3031 (TO 3031), was issued on September 20, 2017, at a price of $444,854.24. TO 3031 required WSP to provide emergency power services in Puerto Rico through September 23, 2017. J.A. 10345–47. The second task order, TO W911WN17F3033 (TO 3033), was issued on September 25, 2017, at a price of $5,244,301.09. TO 3033 required WSP to provide emergency power services in the USVI until October 9, 2017. J.A. 10355–58. The third task order, TO W911WN18F3001 (TO 3001), was issued on October 6, 2017, at a price of $300,000.00. TO 3001 required WSP to provide additional emergency power services in Puerto Rico until October 14, 2017. J.A. 10370–72. All three task orders were issued during OY2 and were each assigned to

CLIN 2001 for ACI Emergency Power supplies and services.[6]

Within days of their issuance, and continuing into 2018, the government modified each task order numerous times "to increase funding and/or extend the mission."[7] J.A. 7. Each task order modification, even those occurring after the expiration of OY2, stated that the additional funds were allocated to CLIN 2001. WSP signed each of the modifications.

On November 15, 2017, recognizing the unprecedented "size, duration, devastation, and logistical challenges" presented by Hurricane Maria, USACE submitted a Justification and Approval (J&A) which sought to increase the ceiling amount of the contract "by $860,000,000 from $95,000,000 to $955,000,000." J.A. 11746–47. A Senior Procurement Executive approved the requested modification on November 21, 2017, pursuant to their authority under 10 U.S.C. § 2304(c)(2), as implemented by FAR 6.302-2 (Unusual and Compelling Urgency). J.A. 11756. Like the task order modifications for additional funding, the modification pursuant the J&A allotted the additional $860,000,000 in ceiling funds to CLIN 2001 while "[a]ll other terms and conditions remained unchanged."

---

[6]    Initially, TO 3001's funding was incorrectly obligated to CLIN 3001. The error was corrected, and the funds were reassigned to CLIN 2001 on October 10, 2017 by a unilateral modification, which WSP signed. *See* J.A. 7.

[7]    The record indicates that TO 3031 was modified 23 times between September 22, 2017 and September 18, 2018; TO 3033 was modified nine times between October 6, 2017 and February 15, 2018; and TO 3001 was modified at least nine times between October 10, 2017 and March 19, 2018. *See* J.A. 7.

J.A. 11757. WSP signed the bilateral modification as required.

Throughout the course of performing the three task orders, and well into 2018, WSP continued to submit all invoices using CLIN 2001 and its corresponding OY2 price rates. J.A. 27512. Yet on July 23, 2018, WSP sent USACE a letter "requesting to revise and resubmit [its] invoices for all task order work performed on or after 22 October 2017 to reflect the correct unit prices for Option Year 3 — CLIN 3001." J.A. 23190. After receiving no response, WSP submitted a formal request for equitable adjustment (REA) on September 28, 2018 seeking $13,489,630, the difference between the price at OY2 unit prices previously invoiced and OY3 unit prices for work performed during OY3 through August 29, 2018. J.A. 24603. On February 20, 2019, WSP submitted an adjusted REA revising the requested amount to $14,220,817 to account for work performed "from August 29, 2018 through the end of the mission on November 20, 2018." J.A. 25816. USACE's Contracting Officer (CO) denied the REA in its entirety on May 17, 2019. J.A. 25905–06.

After USACE's denial, on March 16, 2020, WSP submitted a certified claim under the Contract Disputes Act, 41 U.S.C. §§ 7101–09, "seeking payment in the amount of $14,069,044.60 . . . reflect[ing] the difference between" the OY2 rates and OY3 rates. J.A. 26379. The CO denied WSP's claim in a final decision issued on July 1, 2020. J.A. 27509–14. On September 24, 2020, WSP appealed the CO's decision to the Armed Services Board of Contract Appeals (Board), arguing that USACE's failure to pay it at OY3 rates for work that was performed during that time period amounts to "breaches of both the contract and the implied covenant of good faith and fair dealing." J.A. 9. The government disputed WSP's reading of the contract and instead argued that OY2 "prices applied to all work performed under the[] [three] TOs because the TOs were issued during Option Year 2." J.A. 9. The government also

argued the affirmative defense "that WSP failed to timely assert its right to an adjustment under the Changes Clause." J.A. 9.

On October 13, 2022, the Board issued a final decision denying WSP's appeal. Agreeing with the government's interpretation, the Board concluded that "the contract unambiguously provides that the pricing for each TO is set when the order is placed and remains in place for duration of the work under the TO, even if the period of performance extends beyond the original term of the underlying contract or option period." J.A. 1–2. Because the Board concluded that USACE acted in accordance with the contract and there was no breach, it did not reach the implied covenant of good faith and fair dealing issue or address the government's affirmative defense that WSP waived its claim by failing to timely preserve its rights under the Changes Clause. J.A. 13.

WSP timely appealed the Board's decision on December 8, 2022. We have jurisdiction under 41 U.S.C. § 7107(a)(1)(A) and 28 U.S.C. § 1295(a)(10).

II

Under the Contract Disputes Act, a "decision of the [Board] on a question of law is not final or conclusive" and is subject to *de novo* review. 41 U.S.C. § 7107(b)(1); *Triple Canopy, Inc. v. Sec'y of Air Force*, 14 F.4th 1332, 1337–38 (Fed. Cir. 2021). The Board's interpretation of a contract is a question of law to be reviewed de novo. *Agility Logistics Servs. Co. KSC v. Mattis*, 887 F.3d 1143, 1148 (Fed. Cir. 2018); *England v. Contel Advanced Sys., Inc.*, 384 F.3d 1372, 1377 (Fed. Cir. 2004). Nevertheless, we will give the Board's interpretation of a government contract careful

consideration, given the Board's considerable experience and expertise. *Agility*, 887 F.3d at 1148.

## III

The question central to this appeal is whether under the contract, the price for work performed during OY3 pursuant to a task order issued during OY2 is determined by the date the task order is issued or by the date the work is performed. If the former, the correct pricing for the work performed in OY3 pursuant a task order issued during OY2 would correspond with CLIN 2001 rates; if the latter, the correct pricing would correspond with (the higher) CLIN 3001 rates. Because we conclude that the contract is not plainly unambiguous as to whether the pricing for each task order is set when the order is placed and remains set for the duration of work under such order, or rather pricing is based on the actual date of performance, and because we conclude the Board did not properly consider the contract in its entirety as modified by later-issued task orders (and modifications of these task orders) in evaluating the parties' arguments about the proper interpretation of the contract's intended pricing, we vacate the Board's finding that the contract term is unambiguous and remand for reconsideration of the proper interpretation of the entire contract as modified in accordance with this opinion.

## A

In interpreting a contract, we seek to ascertain the joint intent of the parties at the time the contract was formed. *See King v. Dep't of Navy*, 130 F.3d 1031, 1033 (Fed. Cir. 1997) ("The paramount focus is the intention of the parties at the time of contracting; that intention controls in any subsequent dispute."); *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986) (describing the "cardinal rule of contract construction that

14          WSP USA SOLUTIONS INC. v. SECRETARY OF THE ARMY

the joint intent of the parties is dominant if it can be ascertained").

When interpreting a disputed contract provision, we first determine whether the provision is unambiguous, or if it is susceptible to more than one reasonable interpretation. *Premier Off. Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019). In conducting this analysis, [w]e "begin[] with the language of the written agreement," which "must be considered *as a whole* and interpreted so as to harmonize and give reasonable meaning to all of its parts." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc) (emphasis added).

Where a contract's language is clear and unambiguous, "its meaning is to be ascertained in accordance with its plainly expressed intent." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). "In such circumstances, the parties' intent can be determined from the face of the agreement and the language that they used to memorialize [that] agreement." *CITGO Asphalt Ref. Co. v. Frescati Shipping Co.*, 589 U.S. 348, 355 (2020) (internal quotation marks omitted) (alteration in original). Thus, "[w]hen the contractual language is unambiguous on its face, [the] inquiry ends and the plain language of the Agreement controls." *Coast Fed. Bank, FSB*, 323 F.3d at 1040–41.

"To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term, rather, both interpretations must be reasonable." *Premier Off.*, 916 F.3d at 1011 (internal quotation marks omitted).

B

WSP and the Government both argue that the contract is unambiguous as to pricing for work performed in a later operating year pursuant to a task order that issued in a previous operating year. However, they provide different interpretations. WSP argues that the only reasonable

interpretation of the contract is for work ordered during OY2, but performed during OY3, to be priced according to OY3 rates. The Government argues the Board correctly held the contract unambiguously provided that pricing is based on the date of task order issuance. As an initial matter, we hold that the Board erred in failing to consider the contract in its entirety, including all modifications, when conducting its analysis regarding ambiguity of the pricing term. We vacate and remand for the Board to properly investigate the contractual terms by considering the entire contract, including modifications made to task orders issued pursuant to the contract and the contractual provisions for challenging such modifications.

We further disagree with the parties and Board on the merits that the contract is unambiguous as to the pricing of services rendered in a given operating year pursuant to task orders that were issued in prior operating years. We address each party's arguments in turn. The Board "h[eld] that the contract unambiguously provides that the pricing for each TO is set when the order is placed and remains in place for duration of the work under the TO, even if the period of performance extends beyond the original term of the underlying contract or option period." J.A. 1–2. In reaching this conclusion, the Board examined two different FAR clauses included in the contract, the FAR 52.216-21 Requirements Clause and the FAR ¶ 16.505(a)(2) (Ordering). The remainder of the Board's analysis relied on another case. J.A. 12 (citing *Securityhunter, Inc.*, ASBCA No. 60896, 18-1 BCA ¶ 36,981 at 180,135).

Contractual interpretation, including evaluation of contractual terms for ambiguity, is an exercise that requires evaluating a contract "as a whole." *Coast Fed*, 323 F.3d at 1038. This requires considering all the

16          WSP USA SOLUTIONS INC. v. SECRETARY OF THE ARMY

provisions of a contract taken together, including modifications made to the contract after the initial formation.

The contract underlying this appeal is a requirements contract for services as defined by FAR 16.501-2(a). Requirements contracts entered into by the federal government contemplate issuance of orders for the performance of tasks during the period of the contract. *See* FAR 52.216-21(b) ("Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause")*,* J.A. 10059 (FAR 52.216-18(a) (Ordering Clause) ("Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders . . . .")); *see also* 10 U.S.C. § 3401(b). That is, a requirements contract, does not, on its own, create any obligations for the contracting parties to perform the contracted tasks or remit compensation for such performance. Rather, a requirements contract sets up the terms and conditions for task orders that are issued under the contract. These task orders create obligations for the parties to render services and remit payment.

Task orders thus become part of the contract under which they are issued. The Board understands task orders to modify a contract when its terms conflict with the terms of the contract. *See Indian and Native Am. Employment and Training Coalition,* 64 Comp. Gen. 460, 460 (1985), 85–1 CPD ¶ 432. (discussing "the modification to the contract by the task order"). Modifications to task orders issued pursuant a contract are accordingly also properly understood as modifying the contract pursuant to which they are made. While the contract states that "[i]n the event of conflict between a . . . task order and this contract, this contract shall control," J.A. 10058, this provision is properly understood to not apply to conflicts between task orders and the contract which arise from modifications, which by nature change something about the contract terms.

While the Ordering Clause of the contract states "[i]n the event of conflict between a delivery order or task order and this contract, the contract shall control," J.A. 10058, modifications to task orders issued under a contract can be understood to elucidate the meaning of terms in the underlying contract. In this case, several of the relevant modifications were bilateral modifications since the government and WSP signed each modification.[8]

The task orders issued pursuant this contract were subject to dozens of modifications during the contract's duration. Each of these modifications were made using Standard Form 30 (SF 30), which is entitled "Amendment of Solicitation/Modification of Contract." Further, though these modifications may have been executed unilaterally by the Contracting Officer, FAR 52.243-1 Alt I(a), several of the modifications, particularly those most relevant to the issues raised in this appeal, were signed by a representative of WSP.

The parties' continuing transfer of funds to CLIN 2001 to prevent exceeding its NTE amount, even during OY3, may inform the Board's interpretation that a task order's pricing remains fixed to the CLIN it is issued under for the duration of its performance, even when such duration of performance extends into another operating year. On at

---

[8]    We note that, insofar as WSP had an issue with any of the modifications made to the TOs that the Contracting Officer was able to make unilaterally, the proper course of action would have been to (1) refuse to sign the modification and/or (2) request submit a proposal for equitable adjustment under the contract's Changes Clause within 30 days if the "change causes an increase or decrease in the cost of, or time required for, performance of any part of the work under [the] contract." FAR 52.243-1 Alt I (incorporated into the contract at J.A. 10057).

least four occasions between September 7, 2017 and November 3, 2017 (*i.e.*, during both OY2 *and* OY3), over $85,000,000 was transferred "from CLIN 3001 to CLIN 2001 *to ensure that sufficient ceiling is available* for hurricane response missions." *See, e.g.*, J.A. 10935 (emphasis added). WSP did not contest moving funds to CLIN 2001 after OY2 expired and OY3 commenced on October 22, 2017. Instead, WSP signed all four of the ceiling transfers to CLIN 2001. This is because, in accordance with the contract, the parties needed to increase the task orders' funding to prevent the cost of performance from exceeding CLIN 2001's NTE amount. Furthermore, the November 22, 2017 contract modification, which increased the contract ceiling to nearly one billion dollars, allotted the entire $860,000,000 increase to CLIN 2001. J.A. 11757. At the time of this modification, WSP again did not oppose this allocation of funds to CLIN 2001 but *agreed* to the bilateral modification. *See* J.A. 11757 (requiring the contractor to sign the modification). Insofar as the relevant TO modifications modify the period of performance for a TO issued under a particular CLIN such that the new period of performance extends beyond the period of performance originally provided by the contract for that CLIN, these modifications are properly understood as modifications to the underlying contract. These modifications should have been considered as part of the whole contract in evaluating the ambiguity of the pricing provision.

Because the Board too narrowly focused on the contract's Requirements and Ordering Clauses, it did not consider the effect of the modifications made to the TOs on pricing and failed to consider the contract as a whole. This deficiency in its analysis precludes us from being able to affirm its conclusion that the contract unambiguously provides that provides that the pricing for each TO is set when the order is placed. We therefore vacate the Board's holding that the contract is unambiguous as to pricing and remand for the Board to investigate the pricing provisions of the

contract accounting for the modifications made to the task orders.

## C

We also reject both WSP's and the Government's arguments that the pricing is unambiguously based on the date of performance or the date of TO issuance, respectively. In challenging the Board's interpretation and advancing its own purportedly unambiguous reading of the contract, WSP raises four arguments: (1) the Board's interpretation erroneously reads Sections B and F out of the contract; (2) the Board misapplied FAR 52.216-21(f) by conflating the contract's effective period with individual option years; (3) the Board erred by rejecting WSP's reasonable interpretation of the contract; and (4) the Board erroneously relied on extrinsic evidence to interpret the contract after concluding the language was unambiguous. We address each argument in turn.

## 1

WSP argues that the Board's interpretation reads key terms out of the contract in violation of well-settled contract interpretation law. Appellant's Br. 26. The Board concluded that under the contract, the applicable pricing for work performed under a task order is "established at the time the task order is placed and those obligations remain fixed for the duration of the work required under that order." J.A. 11. WSP contends this "interpretation renders meaningless the contract's Section B terms," Appellant's Br. 26, and "effectively writes Section F out of the contract," Appellant's Br. 29. We conclude that neither Section B nor Section F unambiguously supports either parties' interpretation of proper pricing under the contract.

Section B of the contract contains CLINs for the Base Year and each of the four option years. Each CLIN provides generalized details relating the contract's supplies and services, prices, and periods of performance. *See* J.A. 10002–

11. WSP argues Section B also requires any "amount of the Task Order that was not used up" by the end of OY2 (*i.e.*, October 21, 2017), to "rollover" to OY3 beginning October 22, 2017. *See* Appellant's Br. 27. WSP cites the provision in CLIN 3001 that "the total not to exceed amount [for OY3] will be *the unexpended amount remaining from option year two.*" *Id.* at 26–27 (emphasis added) (citing J.A. 10008). WSP contends that as a result, "Section B[] plainly provides for removing 'the unexpended amount' from the Option Year 2 performance period and placing it on Option Year 3." *Id.* at 27.

While WSP's interpretation is reasonable, when read in the context of the contract as a whole, Section B may also be reasonably understood to merely provide the basis for calculating the correct ceiling and NTE amount for a given CLIN. The provision's reference to the "NOT TO EXCEED AMOUNT" may be intended to prevent the parties from ordering or performing work under a given CLIN that would exceed the contract's maximum value or available ceiling. In that case, the provision does not necessarily require any unexpended amounts to "rollover" at the end of an option year. Indeed, when read in conjunction with WSP's discussion about increasing a task order's funding, *see* J.A. 10021 ("[W]hen the contractor has exceeded . . . 90% value of the 'not-to-exceed' task order dollar amount[, d]emobilization shall commence if the task order funding is not increased."), the CLIN language in Section B can be reasonably read to authorize rolling unexpended funds *back* to a previous year's CLIN to prevent a task order from exceeding a CLIN's NTE amount. Section B is accordingly not unambiguous.

WSP also argues the delivery dates in Section F's "DELIVERY INFORMATION" chart unambiguously tie each CLIN to a specific period of performance. Appellant's Br. at 39. Section F sets forth geographic performance areas and delivery information. *See* J.A. 10051–52. The delivery information lists the specific dates of the period of

performance for each CLIN. J.A. 10051–52. The period of performance for CLIN 2001, which corresponds to OY2, is listed as "22-OCT-2016 TO 21-OCT-2017," and the period of performance for CLIN 3001, which corresponds to OY3, is listed as "22-OCT-2017 TO 21-OCT-2018." J.A. 10052. WSP thus argues that "Section F plainly ties each CLIN and CLIN rate to the *period of performance*," such that "the rate applicable to the performance of services" is determined by the date those services are performed. Appellant's Br. 31.

While we agree with WSP's assertion that CLINs are tied to periods of performance, we disagree that this connection unambiguously requires work pursuant to a task order to be priced based on when it is performed rather than when it is ordered. When a task order is issued, it must contain a "[d]ate and time of issuance" and a "[p]eriod of [p]erformance for services to be performed." J.A. 10054–55. The applicable rate for work performed pursuant a TO can thus be properly read to be based either on the CLIN corresponding to the date of the TO's issuance or the CLIN the covers the period of performance. Therefore, Section F also fails to unambiguously define the pricing provision per either parties' interpretation.

WSP also argues the Board misapplied FAR 52.216-21(f) to find the contract pricing unambiguous because this provision does not apply to the facts here. We agree.

The Board correctly noted that this provision "states that the rights and obligations of the parties (e.g., pricing) are established at the time the task order is placed and . . . remain[] fixed for the duration of the work required under that order." J.A. 11. However, FAR 52.216-21(f) states that it applies to "[a]ny order *issued during the effective period of this contract and not completed within that period* shall be completed by the Contractor within the time specified in the order." J.A. 10059 (emphasis added); *see also*

J.A. 10058–59 (incorporating the Requirements Clause by full text).

When the contract was awarded on October 22, 2014, it had an initial effective period of one year, with the ability to exercise up to four additional options to extend the contract for an additional year. Because option years 1 through 3 were exercised, the contract ultimately had an effective period of October 22, 2014, to October 21, 2018. Because all three task orders were issued during the *contract's* effective period and performed before its expiration, FAR 52.216-21(f) of the Requirements Clause is inapplicable. This section accordingly does not support either parties' interpretation of the correct pricing determination methodology.

WSP further argues that its interpretation is the only one that "gives meaning to all of the contract provisions" and argues "the contract Schedule, consisting of Sections A through G," are rendered "'meaningless and superfluous'" by the government's interpretation. Appellant's Br. 37 (quoting *Medlin Constr. Grp., Ltd. v. Harvey*, 449 F.3d 1195, 1200–01 (Fed. Cir. 2006)). However, the bulk of WSP's argument focuses on Sections B and F of the contract. *See id.* at 37–41. As previously discussed, neither parties' interpretation renders Section B or Section F of the contract meaningless or superfluous.

WSP argues the Board erroneously relied on extrinsic evidence to interpret the contract after concluding the language was unambiguous. Appellant's Br. 41. Because we conclude the Board incorrectly concluded the contract language was unambiguous, we need not address this argument.

2

The Government argues the Board correctly concluded that the contract was unambiguous. The Board found the contract was unambiguous and that the price of the

contract (i.e., which option year pricing would apply) was determined at the time the task orders issued. However, the contract provides specific periods of performances corresponding to each option year; task orders issued under those option years may be reasonably read to be expected to comply with those periods of performance. The contract at FAR 52.217-8 discusses what happens when performance must take place after a contract expires (i.e., when an option to extend the contract for an additional year is not exercised), but such a scenario is not implicated when an option is exercised and the contract does not expire, as is the case here. J.A. 10059.

D

For these reasons, we do not currently have before us a convincing reason to conclude that the contract taken as a whole, including modifications, supplies an unambiguous answer to the question of which contract rates apply to the costs at issue—for performance during OY3 of work specified under a task order issued in OY2, as modified both during and after OY2. A fuller and more focused analysis is required. Such an analysis might yet lead to a sound conclusion that the contract as a whole is ultimately unambiguous in the circumstances presented, interpreting "specific language in light of the contract as a whole," *Garcia v. Dep't of Homeland Sec.*, 780 F.3d 1145, 1147 (Fed. Cir. 2015), and "interpret[ing] the contract in a manner that gives meaning to all of its provisions and makes sense," *Id.* (quoting *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)). If such a conclusion cannot be reached, the analysis must proceed to the steps called for to resolve contract-interpretation disputes when ambiguity remains in the respect specifically at issue. *See, e.g., CITGO Asphalt Refining Co. v. Frescati Shipping Co.*, 589 U.S. 348, 355 (2020); *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 438–42 (2015); *HPI/GSA 3C, LLC v. Perry*, 364 F.3d 1327, 1334–35 (Fed. Cir. 2004).

IV

Because we conclude the Board erred by failing to consider the contract as a whole in evaluating whether the contract is ambiguous as to pricing and reject both parties' arguments that the contract's pricing scheme is unambiguous, we vacate the Board's finding that the contract is unambiguous and remand for reconsideration of the proper interpretation of the contract including all relevant modifications in accordance with this opinion.

**VACATED AND REMANDED**

COSTS

Costs to appellant WSP.